# ABLEMAN *vs.* BOOTH, and the UNITED STATES *vs.* BOOTH.

### MOTIONS TO FILE REMITTITURS.

Heard September 22.]                    [Decided December 14, 1859.

## Constitutional Law—Jurisdiction.

Whether section 2, Art. III, of the Constitution of the United States, confers upon Congress the power to provide by law for an appeal from the courts of the several states to the supreme court of the United States, and to authorize that court in the exercise of its appellate jurisdiction, to review and reverse the judgments of the state courts, in the cases specified in the 25th section of the judiciary act, approved September 24, 1789, discussed.

In the matter of Booth.

The facts in these cases can very readily be gathered from the opinion of Chief Justice Dixon.  Mr. Justice Paine having been of counsel for Booth in the cases, took no part in the decision of the motions, and the Chief Justice and Mr. Justice Cole disagreeing upon the question presented, the motions were denied by an order made in open court, but no opinion has been filed by Justice Cole.

Dixon, C. J.   On the 22d day of September last, and during the present term of this court, the United States District Attorney for the district of Wisconsin, D. A. J. Upham, Esq., in behalf of the Attorney General of the United States, appeared before this court, and by motions, entitled in these cases, asked leave to file with the clerk, two mandates or remittiturs, one in each of the cases, from the supreme court of the United States.   The motions were reduced to writing, filed with the clerk, and the attention of the court called to them by the district attorney, but no argument whatever was made.   The mandates were also left with the clerk to be disposed of as the court should direct upon a final determination of the motions.   The former is the title of a suit in error, in the supreme court of the United States, in which that court reviewed and reversed a judgment of this court rendered at the June term, 1854, in a proceeding entitled, " In the matter of the petition of Sherman M. Booth for a writ of *habeas corpus*, and to be discharged from imprisonment," the facts in which, together with the several opinions of the justices of this court, will be found reported in the third volume of Wisconsin Reports, pages, 1 to 144 inclusive.   The latter is the title of a like suit in the supreme court of the United States, in which the decision of this court, made at the December term, 1854, in a proceeding similarly entitled, and reported in the third volume of Wisconsin Reports, pages 157 to 218, was in like manner reviewed and reversed.   The judgments and opinion of the su-

preme court of the United States will be found reported at
length in Howard's S. C. R., vol. 21, page 506.   The man-
dates are in the usual form, requiring the causes to be re-
manded to this court to be further proceeded with in accord-
ance with the opinion there given.   No statement of facts is
required beyond what will be found in the reported cases, ex-
cept that I deem it advisable to state the proceedings had in
this court on the receipt of the writs of error.

In the first case, the writ of error was served on the clerk
of this court on the 30th of October, 1854.   On the 6th of
November following, it was duly allowed by the late Chief
Justice of this Court, now no more, and a return made to it
by the clerk, under his direction and supervision.   The ser-
vice of the writ in the last case was made about the 1st of
June, 1855.   On the 26th day of March, previous, the clerk
had made and delivered to the United States district attorney,
at his request, a properly certified copy of the record.   On re-
ceipt of the writ, the attention of the court was called to it
by the clerk, when he was advised to make no return until
specially advised so to do.   He was afterwards directed to
make no return.   The matter remained in this situation un-
til the January term, 1857, when at his request, it was deem-
ed proper by the court that an order, embodying the instruc-
tions which had heen previously given, and which were
merely verbal, should be made and formally entered of record.
Such order was, accordingly, on the 5th day of February,
1857, made, signed by the Chief Justice, and entered of re-
cord, by which the court, after reciting and comfirming the
previous verbal instructions, directed the clerk to make no
return.   It may not, perhaps, be improper for me further to
remark here, that in addition to what is already apparent
from the above statement of facts, it is further evident from
the opinion of the late Chief Justice in the case first above
cited, 3 Wis. Rep., pp. 63 and 64, that at and before the time

of the service and return of the first writ of error, he entertained no doubt of the appellate jurisdiction of the supreme court of the United States. After commenting upon the decisions which had before that time been made by that court as to the power of congress to legislate on the subject of the surrender of fugitives from labor, and showing that the point which he was then considering, had not been passed upon in those decisions, he says: "We are of the opinion, therefore, that whatever may be the duty of this court in relation to the question of the power of congress to provide by law for the surrender of fugitives. from labor to the persons to whom their labor is due, we are not at liberty to consider the question of the right of a person claimed as a fugitive to a trial by jury, before he can be surrendered or delivered up to the claimant, *as already settled by the court, which has the power finally to decide all questions growing out of an alleged violation of the constitution of the United States by an act of Congress.* We must consider the question as an open one."

The only question that is or can be made on the entering and conforming to these mandates is: *Does the constitution of the United States confer on congress the power to provide by law for an appeal from the courts of the several states to the supreme court of the United States, and to authorize that court in the exercise of its appellate jurisdiction, to review and reverse the judgments of the state courts in the cases specified in the 25th section of the judiciary act, approved the 24th of Sept., 1789.?*

The proper solution of this question always vastly and almost immeasurably important on account of the consequences involved, was never perhaps since the commencement of our national career more vitally so than at the present time. No question in an equal degree challenges the earnest and candid attention of the citizen. Certainly none could be presented for our determination which would de-

mand more rigid investigation or more candid and solemn consideration. To the.best of my limited ability, I have endeavored to give it both. In doing so I have been not a little embarrassed by the want of those arguments of experienced and learned counsel by which courts are usually so much enlightened and aided in the investigation of important questions.

Holding, as I feel compelled to, that the affirmative of this proposition is correct, my own embarrassments and its importance to me have been much increased, from what appears to have been the contrary decision of this court, as lately composed, by the refusal to make return to the second writ of error, and from the fact that my brethren entertain an entirely opposite opinion. These circumstances have imposed upon me increased care and watchfulness, and have led me the more anxiously and vigilantly to examine the ground on which I stand, lest I may be in error. Fortunately for me the field of inquiry and argument is not a new one. It is as old as the constitution itself, and had been traversed in its entire length and breadth, and occupied in every available point, by the ablest and most distinguished jurists and statesmen of our country, long before many of the present generation came upon the stage of active life. This ordinarily would relieve me, if indeed I were competent for so great a task, from going over any part of it here, and would leave little to be said except on which side I am. In justice to myself I will say that since the making of these motions, I have been over it again and again, and that to the utmost of my ability, and with a solicitude becoming the position I occupy, and which I never before experienced, I have studied and considered every argument, for and against, within my reach. My sole purpose has been to be right—to assume such a position as under the constitution, will abide the test of reason and patriotism. If I have failed, it is an error of the intellect to which all men are liable.

Under different circumstances, I would not at the risk of repeating what has often been said before, venture to assign a reason for the conclusions to which I have arrived, but would content myself with simply referring the reader to those authorities and works where the whole question will be found fully discussed. But since, in view of what appears to have been the former solemn action of this court, we have arrived at a point in our system of double allegiance, where " fidelity to the state is treason to the United States, and treason to her, fidelity to them," I trust, I shall be excused for stating, briefly as I can, some of the positions taken by those who assert the appellate jurisdiction, which appear to me to be unanswerable, and which in my humble judgment never have been, and never can be shaken by those who oppose it.

Before proceeding to state these views, I wish to say that in disposing of this question, I have endeavored to decide it on the constitution itself fairly and legitimately interpreted, well remembering " that 'a frequent recurrence to fundamental principles,' is the only means of sustaining the government in its original purity, and of preserving the original landmarks established by its framers," and believing that those " fundamental principles" are to be found in that instrument and not elsewhere; and believing, furthermore, that if there are evils fairly to be apprehended from its settlement either way, they are such as are necessarily incident to every form of human government, and that they are not to be remedied by any judicial powers of construction which would give to the government an authority which it does not possess, or take from it any which is conferred by the constitution; but that the remedies lie in the hands of the people who created it, and who can apply them or not, as experience and wisdom shall dictate. I have not, therefore, on the one hand, pictured before my mind a gloomy congregation of states " disrobed"

of their sovereignty, and prostrated at the feet of the general government by means of federal usurpation and assumption, nor, on the other, the weakened and powerless republic, begging at the hands of the mighty rulers of the states, the privilege of executing her laws within their borders. I have not placed on one side of me the horrors of "consolidation" and " despotism," and on the other those of " dissolution" and "anarchy," and endeavored to make choice between them. Neither have I attempted nicely to adjust and balance the centripetal and centrifugal forces of our government. These, though very proper to be considered in connection with such a question, are not the considerations which should control and govern the judicial mind. Its action is to be determined by the plain letter and spirit of the constitution, leaving the adjustment of such matters to the people who made, and who can unmake, or amend it. The judiciary are not responsible for the consequences which flow from a proper construction of that instrument. While I have a high regard for those illustrious judges and statesmen whose opinions I adopt, I trust it does not diminish my respect for those equally illustrious, who differ from them in opinion. I have not yielded my assent to the doctrines of the federal courts through any mean spirit of "dignified judicial subordination," nor as " hoary usurpations of power and jurisdiction, or time-honored encroachments on the reserved rights of the sovereign states," rendered sacred by "their antiquity," but because I believe those doctrines to be right. Neither policy, expediency, " uniformity," the peculiar characteristics of the controversy before me, nor vague speculations upon possible events, or contingencies which may never happen, are the foundations upon which I would frame a legal conclusion upon a constitutional question. With these remarks I will state the view of the constitution which, for the most part, leads me to the conclusion to which I have arrived.

The 25th section of the judiciary act above referred to, provides "that a final judgment or decree in a suit, in the highest court of law or equity in a state in which a decision in the suit could be had, where is drawn in question the validity of a treaty or statute of, or an authority exercised under the United States, and the decision is against the validity; or where is drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of their being repugnant to the constitution, treaties, or laws of the United States, and the decision is in favor of such their validity; or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under the United States, and the decision is against the title, right, privilege or exemption specially set up or claimed, by either party, under such clause of the said constitution, treaty, statute, or commission, may be re-examined and reversed, or affirmed in the supreme court of the United States upon a writ of error, &c.," and that " no other error shall be assigned or regarded as a ground of reversal in any such case as aforesaid, than such as appears on the face of the record, and immediately respects the before mentioned questions of validity or construction of the said constitution, treaties, statutes, commissions, or authorities in dispute." That this section confines the appellate powers of the supreme court strictly within the limits of the constitution, provided such appellate powers exist, or are given at all, I believe has never been seriously disputed. Mr. Calhoun, in his " Discourse on the Constitution and Government of the United States," when commenting on the section in question, and the clauses of the constitution granting and defining the judicial power, says (Calhoun's Works, vol. 1, page 321), "The question is thus narrowed down to a single point. Has Congress the authority in carrying this power into execution, to make a law providing for an appeal from the courts of the

several states to the supreme court of the United States ?" I shall, therefore, pass directly to the consideration of the powers conferred by the constitution. The two first subdivisions of the second section of the third article, familiar to all, are as follows :

" 1. The judicial power shall extend, to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admirality and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states, between citizens of different states, between citizens of the same state, claiming lands under grants of different states' and between a state, or the citizens thereof, and foreign states, citizens, or subjects.

" 2. In all cases affecting ambassadors, other public ministers, and consuls, and those to which a state shall be a party, the supreme court shall have original jurisdiction. In all the other cases before mentioned, the supreme court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make."

The jurisdiction here conferred has been very properly divided into two parts; that which arises out of the subject matter, and that which arises out of the character of the parties litigant. Mr. Calhoun, without his usual accuracy, page 259, says: " The first clause which extends it ' to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which may be made under their authority, embraces the former; and the residue of the section, the latter." This, as a general proposition, may be true, but is not exactly so. " Controversies between, citizens of the same state, claiming lands under grants of dif-

ferent states," are clearly cases where it is the subject matter and not the character of the parties litigant, which gives jurisdiction. The general rule drawn from this subdivision, as it respects jurisdiction given by the character of the parties litigant, without regard to the nature of the controversy, being, that as between citizens of the same state, the federal courts have no jurisdiction, whilst between those of different states, they have; and that as between the latter, their jurisdiction would attach in such cases, without the aid of this clause, whilst as between the former, it would not; it is evident that it is the subject matter, and not the character of the parties litigant, which confers jurisdiction in such controversies. The same remarks are true of " cases of admirality and maritime jurisdiction." This, however, is evidently an oversight on the part of the learned commentator—not necessary perhaps to have been noticed here. The whole controversy hinges upon the proper signification of the words, " all cases in law and equity," in the first subdivision.

As there is no provision in the constitution which expressly gives to Congress the power to provide for appeals from the state courts to the supreme court of the United States, if such power exists on the part of Congress it must be because the constitution itself vests in the supreme courts of the United States such appellate power, and because such legislation becomes necessary and proper to carry such power into execution. The 17th subdivision of sec. 8, of Art. I, the previous subdivisions of which are specifications of the express powers given to Congress, provides that Congress shall have the power " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or any department or officer thereof."

Now, whether such jurisdiction is vested in the judicial department of the government or not, depends on the meaning

of the words, "*all cases in law and equity.*" The supreme court of the United States have twice, upon full argument, first, in 1816, in the case of *Martin vs. Hunter's Lessee*, 1 Wheat., 304; and secondly, in 1821, in *Cohens vs. Virginia*, 6 Wheat., 264, passed directly on the question and decided that these words mean all cases in law and equity in any court within the United States, whether state or federal, in which a right of action or a defense arises or is claimed under the constitution, laws or treaties of the United States; and hence that the appellate jurisdiction of that court under the second subdivision of the section, extends to all such cases, "with such exceptions and under such regulations" as Congress has made by the 25th section of the judiciary act. These decisions have since been almost universally acquiesced in and regarded by the state tribunals as the *settled* law of the land. The first of these cases arose under circumstances of peculiar delicacy and interest. Martin, the plaintiff in error, had obtained from the supreme court of the United States, a writ of error requiring the court of appeals of Virginia to certify to the supreme court, for re-examination, the record of the judgment rendered by them in the case at the April term, 1810, reported 1 Munf., 218. The president of the court of appeals complied with the writ by certifying a transcript. The supreme court, at the February term, 1813, 7 Cranch, 603, reversed the judgment rendered by the court of appeals, and issued its mandate to that court, requiring the judgment rendered by them to be carried into due execution. This mandate the court of appeals, at April term, 1814, refused to obey, and resolved that the appellate power of the supreme court of the United States did not extend to that court; and that so much of the act of Congress as extended the appellate jurisdiction of the supreme court to that court, was not warranted by the constitution, and that the proceedings of the supreme court were *coram non judice* as to that court.

This proceeding of the court of appeals with the arguments of the judges, which have been very little strengthened by what has been said since that time, and who severally filed opinions, will be found reported in 4 Mumford, 1. Upon this refusal a writ of error was awarded, and the cause was brought again before the supreme court of the United States, in the case above cited, in which the judgment of the court below drew in question and denied the validity of the statute of the United States, giving an appeal from the state court. The validity of this statute was the only question before the court. The court in these cases observed what must, I think, be obvious to every unprejudiced mind, and what those who deny the appellate power, admit, as I shall hereafter show, that the object and effect of the first clause of the 3d section of Art. III, which extends the judicial power to all cases in law and equity, arising under the constitution and laws of the United States, and treaties made under their authority, is to make that power co-extensive with the constitution, and adequate to the protection and enforcement of all the rights and powers given by it; a power which is so indispensable to the existence of every government, that, with the exception of cases affecting ambassadors and other public ministers and consuls and cases of admiralty and maritime jurisdiction, which are essential to the sovereignty of the Union, as they enter into and affect national rights and policy, and the law and comity of nations, the jurisdiction conferred by the remaining clauses, which mainly depends on the character of the parties litigant, becomes comparatively unimportant, being almost entirely unnecessary to the effectual operations of the government, and given through motives of policy and expediency, to avoid those state attachments and prejudices which it was supposed might render such controversies more safe in the hands of the federal than the state tribunals, and for the purpose of extending the power of the federal courts to cases to which otherwise it would

not extend, under the general grant 'contained in the first clause. Such is the plain and obvious import of the language used, and it seems to me that no refinement of construction can remove, or take it away. The powers granted by the first clause were of paramount importance to the very existence of the future government, and could not have been overlooked or misunderstood by the framers, whilst those given by the other clauses, especially the two last, might have been entirely omitted without serious consequences.

The court further supposed, what Congress by the passage of the statute in question supposed, that the framers of the constitution contemplated that cases within the cognizance of the courts of the United States would arise in the state courts in the course of their ordinary jurisdiction ; and that the state courts would and must incidentally take cognizance of and decide cases arising under the constitution, laws and treaties of the United States. This position, those who deny the appellate jurisdiction, not only assume to be correct, but, with the exception of Judge Cabell, of the court of appeals of Virginia, who in his opinion in *Martin vs. Hunter*, 4 Mumf., 15, intimates a contrary conclusion, insist that there is no power on the part of Congress, by legislation, to withdraw such cases from the cognizance and jurisdiction of the state courts.

It was further remarked by the court that the constitution unavoidably dealt in general language ; that it did not provide for minute specification of powers, or declare the means by which those powers should be carried into execution. It was foreseen that this would be a difficult and perilous, if not an impracticable task. Hence its powers were expressed in general terms, leaving it to Congress from time to time to adopt its own means to carry into effect legitimate objects, and to mould and model the exercise of its powers, as its own wisdom and the public interests should require. They ob-

served that a distinction seemed to be drawn between the two classes of cases enumerated in the constitution. The first class included cases arising under the constitution, laws and treaties of the United States; cases affecting ambassadors, other public ministers and consuls, and cases of admiralty and maritime jurisdiction. In that class the expression was that the judicial power should extend to *all classes.* That as these cases were of vital importance to the sovereignty of the union, the original or appellate jurisdiction in them, ought therefore to be commensurate with the mischiefs intended to be remedied, and the policy in view. But that in the subsequent clauses, which embraced all the other cases of national cognizance and formed the second class, the constitution seemed, *ex industria,* to drop the word *all* and to extend the judicial authority not to all controversies, but to controversies in which the United States should be a party, &c., leaving it to Congress to qualify the jurisdiction, original or appellate, as sound policy might dictate. It was furthermore said by the court that, as the state tribunals might, in the exercise of the powers with which the Constitution found them invested, as the courts of independent sovereignties, have and exercise concurrent original jurisdiction over all or some of the cases provided for in the constitution, and as the constitution contemplated that they should exercise such jurisdiction, and as many cases under the constitution, laws and treaties of the United States might arise in the state courts, which could not originate or exist in the federal courts, it would necessarily follow, if the constitution was held to limit the appellate jurisdiction to cases pending in the courts of the United States, notwithstanding the absolute and imperative language of the constitution, that " the judicial power shall extend to all cases in law and equity, arising under this constitution, &c.," that there would be a very large class of cases under the first and most important clause of the section which could never be

reached by the federal courts, either by virtue of their original or appellate jurisdiction.

It is this conclusion, to which a denial of the appellate jurisdiction inevitably leads, that determines my mind upon the question. I have looked in vain through the arguments and commentaries of those who maintain that there is no appellate jurisdiction, for a satisfactory answer to it. I can find none. It is either passed in silence, or with a few general remarks, founded, for the most part, on assumptions which cannot be sustained. It virtually makes the first and leading clause, which declares that the judicial power of the federal courts shall extend to all cases arising under the constitution, laws and treaties of the United States, a dead letter —mere surplussage, and limits those courts, in a great majority of instances, to taking jurisdiction of such cases merely as an *incident* to the jurisdiction which they acquire by *reason of the character of the parties litigant* under the minor grants of power contained in the subsequent part of the section: for all practical purposes under such construction, the first clause might as well have been entirely omitted. The judicial power of the federal courts would have been nearly as extensive, without, as with it, the only difference being that with it, a shadow of power is given with reference to a particular, and by far the least numerous of any class of cases, where otherwise the character of the parties would not confer jurisdiction; that is, in those cases where the plaintiff is able, from the nature of his case, to set up in his declaration or complaint, some right or equity against the defendant, arising under the constitution, laws or treaties of the United States. In such cases, the facts conferring jurisdrction, would, by the plaintiff's showing, appear affirmatively upon the record, and the court might entertain the case. Without the power of appeal, this, so far as I can see, is the utmost practical effect that can be given to the clause

in question.   Such a construction, if it were not directly at war, with the words used, is, in my opinion, altogether too narrow and illiberal.   It makes the provision altogether inadequate for the ends designed to be attained by it, viz: Protection and preservation to the government, by means of its own judiciary, and an equal regard to the constitutional rights of all of its citizens.

Can it be reasonably contended that the framers, by the clause in question, intended to provide that a plaintiff in certain cases, but not in all, should have the privilege of having his rights, arising under the constitution and laws of the United States, determined in their courts, and that in no case should such privilege be extended to a defendant; and that such should be the extent of the jurisdiction of the federal judiciary, in cases arising under the constitution, laws and treaties of the United States as such? Such a provision gravely inserted in such an instrument would justly excite ridicule.  " A case in law or equity," says Chief Juitice Marshall, " consists of the right of one party as well as of the other, and may be truly said to arise under the constitution or a law of the United States, whenever its correct decision depends on the construction of either."   Such a construction would, furthermore, place it in the power of any one state, beyond all peaceful remedy to arrest the execution of the laws of the entire Union, and to break down and destroy at pleasure every barrier created and right given by the constitution.   But aside from these or similar considerations, it seems to me that by limiting the judicial power to a few cases only, it violates the plain language of the constitution, which declares that such power shall extend to *all* cases in law or equity arising under it and under the laws and treaties of the United States.   It is a familiar rule in the construction of written instruments, often applied by the courts of this country in the interpretation of constitutions, that

Vol. XI.                        33

they are to be so construed as to give effect to all their parts, especially when such construction is in harmony with the whole instrument, and supported by the plain sense of the words used. Such is the case with regard to the appellate power in the section before us. The practical result of a contrary construction may be illustrated by a single example. Suppose a state were to pass a law that as between its own citizens the bills of certain banks should be a good tender in payment of debts. Laws akin to this have been enacted. Kentucky, in 1820, passed a law authorizing the defendant in any judgment or decree theretofore or thereafter obtained to replevy for two years all property levied on by virtue of any execution issued upon any such judgment or decree, unless the plaintiff, his agent or attorney, should endorse on the execution a direction in writing that the bills of either of two banks of that state, or their branches might be received by the officer in discharge of the whole of such execution. Suppose that under such law the debtor, relying on the same as a defence, tenders the bills of such banks to the creditor in payment of his debt. Now, although the law palpably violates the constitution of the United States, and the defence urged under it is, for that reason invalid, how is the judicial power of the federal courts ever to be extended to such a case?

There is nothing in the character of the parties which gives jurisdiction. The creditor can make no averment which will confer it. If he brings his action before any of those courts, it must, on the debtor's motion be dismissed. Thus it will happen, that the very party whose constitutional rights have been violated, and who is therefore deeply interested in obtaining redress and protection at the hands of the tribunals established by the constitution for that purpose, is forever precluded from doing so, although it expressly declares that their power shall extend to *all*

*cases* arising under it; and he is compelled, if at all, to seek an ultimate remedy before the courts of the state of whose action he complains. Like illustrations might be made in the case of a state law impairing the obligation of contracts, of which the books abound in instances, *ex post facto* laws, bills of attainder and state laws directly impeaching the laws and treaties of the United States, but it is deemed unnecessary. The effect of this construction is not, as is claimed by its advocates, to make the jurisdiction of the state courts in cases arising under the constitution, laws and treaties of the United States, *concurrent* merely with the jurisdiction of the federal courts, but in a great majority of instances to make it absolutely and entirely *exclusive*—a position which it seems to me disproves itself, by proving too much.

The supreme court, in the cases which I have cited, referred to other parts of the constitution, and entered into profound and elaborate arguments in support of their position, drawn from the early action of the federal and state governments and the theory and nature of government itself, which I deem it unnecessary to repeat here. Chancellor Kent, in the 1st volume of his Commentaries, page 349, while commenting on the 25th section of the judiciary act, and the decisions of the supreme court above referred to, says: " All the enumerated cases of federal cognizances are those which touch the safety, peace and sovreignty of the nation, or which presume that state attachments, state prejudices, state jealousies and state interests, might sometimes obstruct or control the regular administration of justice. The appellate power in all these cases, is founded on the clearest principles of policy and wisdom, and is deemed requisite to fulfil effectually the great and beneficent ends of the constitution. It is likewise necessary in order to preserve uniformity of decision throughout the United States, upon all subjects within the purview of the constitu-

tion; and the mischiefs of opposite constructions and contradictory decisions in the different states, on all these points of general concern, would be deplorable. The supreme court, by a train of reasoning which appears to be unanswerable and conclusive, came to the decision, that the appellate power of the United States did extend to cases pending in the state courts, and that the 25th section of the judiciary act of 1789, authorizing the exercise of this jurisdiction in the specified cases by a writ of error, was supported by the letter and spirit of the constitution."

I have quoted from the learned Chancellor, because he is justly considered one of the purest, most enlightened and patriotic of American jurists, and because, during all of his long, useful and illustrious public career, he never held a federal office, but was elevated to the highest posts of judicial honor in his native state, and cannot, therefore, be justly said to have had any of those attachments to federal power, and inclinations to encroach upon the sovereignty of the states, which are so often attributed by the advocates of the opposite doctrine to the eminent men who have composed the Supreme Court.

The theory of those who maintain the opposite doctrine is, that the word " cases " is a technical term, (I use Mr. Calhoun's language,) defined in law to be a suit commenced, and that it " comprehends only suits or proceedings instituted in the federal courts invoking the exercise of the judicial power of the United States ;" that the second section of the third article, when construed in connection with the first section, which provides that " the judicial power of the United States shall be vested in one Supreme Court, and such inferior courts as the Congress may, from time to time, ordain and establish," is to be deemed to refer only to the courts to be established under the first section, and that the appellate power granted applies only to the removal of cases from the

inferior federal courts to the Supreme Court; in other words, that *appellate* jurisdiction only exists in the Supreme Court in those cases where the inferior federal courts possess *original* jurisdiction. The radical defect of this doctrine is, that by giving this narrowed meaning to the word " *cases,*" it almost entirely cuts off, as has been above shown, the power of the federal courts with which the advocates of this doctrine themselves admit it was the intention of the framers to invest them by the clause. in question, and vests it *exclusively* in the state courts.

Mr. Calhoun, at page 259 of his Discourse, in speaking of this first clause of the second section, says: "It is clear on its face, that the object of the clause was to make the jurisdiction of the judicial power *commensurate* with the authority of the constitution and the several departments of the government, as far as related to cases arising under them, and no further."

And again, on page 321, in speaking of the first sub-division of the second section, which for convenience he divides into two clauses, viz: such as confer jurisdiction with reference to the *subject matter,* and such as confer jurisdiction with reference to the parties *litigant,* he says: "The object of the former of these two clauses is simply to extend the judicial power, so as to make it commensurate with the other powers of the government." It is very difficult for me to perceive how, under the first clause, the judicial power of the federal courts is made *commensurate* with the authority of the constitution, and the other powers of the government, so long as the clause is to be so construed that such power can in no event reach a great majority of the cases arising under them. On page 328, he explains to us how he would make the judicial power *partially* commensurate, and in doing even so much, he is obliged to assume, as we shall see, what is not true in point of fact. He says: "The exten-

sion of the judicial power of the United States, so as to make it commensurate with the government itself, is sufficient, without the aid of an appeal from the courts of the states, to secure all the uniformity consistent with a federal government like ours. *It gives choice to the plaintiff to institute his suit, either in the federal or state courts, at his option.* If he select the latter, and its decision be adverse to him, he has no right to complain; nor has he a right to a new trial in the former court, as it would, in reality, be, under the cover of an appeal. *He selected his tribunal, and ought to abide the consequences.* But his fate would be a warning to all other plaintiffs in similar cases. It would show that the state courts were adverse, and admonish them to commence their suits in the federal courts; and thereby uniformity of decision, in such cases, would be secured. Nor would the defendant, in such cases, have a right to complain, and have a new trial in the courts of the United States, if the decision of the state courts should be adverse to him. If he be a citizen of the state, he would have no right to do either, if the courts of his own state should decide against him ; nor could a resident of the state, or sojourner in it, since both, by voluntarily putting themselves under the protection of its laws, are bound to acquiesce in the decision of its tribunals."

Now, admitting by the narrow notions to be implied from the language here used, that we acquire no rights by virtue of our character as citizens of the United States, and that these wise and beneficent provisions of the constitution were intended only for the benefit of those who can come into court in the character of *plaintiffs*, yet it is not true that *the plaintiff can institute his suit either in the federal or state courts, at his option.* The case above supposed fairly illustrates the incorrectness of this assumption. He cannot in such a case at *his option*, either by the system of legal proceedings which prevailed at the time the constitution was adopted, and with

reference to which it must have been framed, or by any system which has since prevailed, commence his suit with effect in the federal courts. He cannot by any pleading on his part *raise* the question which is to give the court jurisdiction. It must be raised by the defendant, and that as his voluntary act, for the court cannot compel him to set up the defence. If he fails to move a dismissal, but makes any other plea to the action, the suit must still be dismissed, as the jurisdictional facts will not appear. Thus, the plaintiff is compelled to sue in the state court, where the defence is at once made. But admitting that the defendant might set up his defense in the federal court, so as to give it jurisdiction to hear and determine the action, it would then be *the option* of the *defendant*, and not of the *plaintiff*, which would make that court the *forum* for the trial of the cause.

Chief Justice Bartley, of Ohio, in his very able and somewhat celebrated *dissenting* opinion, in the case of *Piqua Bank vs. Knoup*, 6 Ohio State, 342, by a, to my mind, rather " unsatisfactory mode of reasoning," attempts to answer the argument of the supreme court upon this question in *Martin vs. Hunter*, and in so doing falls into the same error. He says: " In the case of *Martin vs. Hunter*, 1 Wheat., 340, the supreme court of the United States concedes the fact, that the language of the constitution *extending* the judicial power to " all cases" arising out of the enumerated subjects, does not confer *exclusive* jurisdiction touching these matters. But Mr. Justice Story says, that " as the state courts will exercise con · current jurisdiction over many of the enumerated subjects, if no appeal can be taken from the state courts to the federal courts, the judicial power of the United States will *extend* only to *some*, and not *all such cases!* This is certainly an unsatisfactory mode of reasoning. If even the right to appeal from the state courts to the federal courts existed, it would frequently happen that an appeal would not be taken from the adjudication in the state court. .

" In such case, could it be pretended that the constitutional exercise of the judicial power of the United States was defeated ? Certainly not. It may be said, however, that the failing party had the *option* to appeal, and bring his case within the judicial power of the United States. But if this extension of the judicial power of the United States to *all cases*, &c., is answered, by leaving it to the *option* of one of the parties to bring the case within the exercise of it, *the option of the party instituting the suit to bring it in the federal courts, is all sufficient.* This would be extending the judicial power of the United States to all of the enumerated cases, in accordance with the constitution, which can mean nothing more than authority to exercise jurisdiction over any of the specified cases, whenever a party shall elect to institute a suit in the federal courts touching the same." Here, again, it is assumed that the constitution provides for courts, and invests them with power to decide cases arising under it for the benefit of *plaintiffs* only, and that they can, if they choose, in *all cases*, institute their suits in the federal courts, and that thus the mandate of the constitution, that the judicial power shall extend to *all cases*, is satisfied. The learned judge is quite right in his concluding sentence, that it is the power to exercise jurisdiction in any case, when its exercise is invoked by either party, and not that it shall in all proper cases be invoked, that is contended for. In another place, *in* commenting on the same clause, he says : " The constitution does not say that the judicial power shall extend to *all questions* arising under the constitution, laws and treaties of the United States. The idea that the judicial power of the United States extends to *every question* arising under the constitution, laws and treaties of the United States, is not only an absurdity, but an impracticability." This branch of his argument was completely answered by Chief Justice Marshall, in *Cohens vs. Virginia,* more than thirty-five years before the

learned judge wrote this opinion. He says: "This may be very true, but by no means justifies the inference drawn from it. The article does not extend the judicial power to every violation of the constitution which may take place, but to a 'case in law or equity,' in which a right under such law is asserted in a court of justice. If the question cannot be brought into a court, then there is no case in law or equity, and no jurisdiction is given by the words of the article."

Much time is spent by Chief Justice Bartley, and those who agree with him in finding fault with Congress for what is said to be a distinction invidious to the state tribunals made by the statute under consideration, by which it is said that the decision of the state tribunals, if they are in favor of the validity of a law of Congress, &c., are presumed to be right, and no appeal is given, but if such decisions are against the validity of such law, then they are presumed to be wrong, and therefore an appeal is given. Much complaint is also made against the supreme court, because it is said that the court always sustains the action of Congress. Whether these accusations be true or false, has but little to do with this question. If it be granted that both Congress and the supreme court have improperly discharged the high trusts reposed in them by the American people, it has no tendency to prove or disprove the existence of this power. But I have already gone much farther than I at the outset intended, and further than I feel warranted in going. The subject is one of much interest, and it is difficult to know where to stop. If I have succeeded in causing some of the principal reasons why I feel bound by the oath which I have taken, to depart from what seems to have been the recent decision of this court on the question under consideration, to be understood, I have done all that I expected or desired to do. In my opinion the motions should be sustained, and the mandates of the supreme court filed with the clerk of this court.

In the matter of Booth.

NOTE BY THE CHIEF JUSTICE. Soon after the foregoing opinion was filed, and at a time when a deep interest was manifested by the press and people of the state in the question involved in it, and the same was the subject of much popular discussion, the following argument from the pen of an able and eminent member of the Milwaukee bar, appeared in one of the newspapers of the day, and was also extensively circulated in the form of a pamphlet. As it is a purely legal argument—a thorough, accurate, and clear exposition of a branch of the law, not entered upon or discussed in the foregoing opinion, but which has a most important bearing upon the subject of it ; as it contains, at the expense of much time and labor, a review of many, and a collection of nearly all of the authorities directly applicable to it, and which I deem it important to preserve; and, as the author, at my request, has kindly consented to my so doing, I cheerfully adopt it as expressing my views of the question as discussed by him, omitting some preliminary observations, and the 25th section of the judiciary act,which the writer quotes at length, the substance of which will be found in the foregoing opinion. He proceeds as follows in reference to it:

That this is a constitutional grant to the federal supreme court of appellate jurisdiction, under sec. 2 of Art. III., of the constitution of the United States, which provides that, " The judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority," has been by solemn adjudication so many times determined, and these adjudications so long and universally acquiesced in by the States of this Union, that the rule of *stare decisis* ought to prevail with the state courts.

I assert, as a legal proposition, that the judicial construction given to a written law, when that construction has long obtained, and been repeatedly acquiesced in and acted upon, is as much a part of the law as though orginally a part of its text, and that, by the solemn determinations, giving such construction, courts are, upon their consciences and by their judicial oath as much bound, as by the plain and express letter of the law. And And in this case I say, as any of us would in an ordinary case concerning a rule of property, the courts cannot, without judicial legislation, or worse, outright nullification, depart from the established and received construction. We are dealing with written laws, and not with such unwritten ones as have their origin in the mere usages of society, and which may alter and adapt themselves to the varying situations of mankind. As to the former, says Sedgwick, in his work on Statutory and Constitutional Law, p. 253, in speaking of the binding influence of judicial construction—"*Stare decisis* is the motto of courts of justice."

On this subject the supreme court of Massachusetts said, in Rogers vs. Goodwin, 2 Mass. Rep., 477: "Were the court now to decide that this construction is not to be supported, very great mischief would follow. And, although were it now *res integra*, it might be very difficult to maintain such a construction, yet, at this day, the *argumentum ab inconvenienti*, applies with great weight. We cannot shake a principle which in practice has so long and so extensively prevailed. If the practice originated in error, yet the error is now so common that it must have the force of law. The legal ground on which this provision is now supported is, that long and continued usage furnishes a contemporaneous construction over the technical import of words."

The same court said, in Packard vs. Richardson, 17 Mass. Rep., 121, "If there is ambiguity in the language, the understanding and application of it when the statute first comes into operation, sanctioned by long acquiescence on the part of the legislative and judicial tribunals, is the strongest evidence that it has been rightly explained in prac-

tice. A construction under such circumstances becomes established law; and after it has been acted upon for a century, nothing but legislative power can constitutionally effect a change.

In a later case, Opinion of the Justices, 3 Pick., 517, the court reiterated the same doctrine. In Rex vs. Younger, 5 Term, Rep., 449, where a question arose upon the construction of a penal statute, Lord Kenyon said: "Thirty four years have nearly passed since the decision of the case of Rex vs. Cox, which informed the public that all bakers have a right to do what is imputed to this defendant as an offense. This circumstance alone ought to have some weight in the determination of this case." Says Lord Mansfield in Wyndham vs. Chetwynd, 1 Burrow, 419, "When solemn determinations, acquiesced under, have settled precise cases, and a rule of property, they ought for the sake of certainty to be observed, as if they had originally formed a part of the text of the statute."

This doctrine has been again and again recognized by all the courts in America and England; and with the single exception of the supreme court of Georgia, no court has been bold or bad enough to disregard the salutary and necessary rule that, in the construction of written laws, courts adhere strictly to the decisions of their predecessors, when those decisions have been repeatedly declared and long acquiesced in. In obedience to their long avowed nullification doctrines, the supreme court of Georgia has, as to this question of appellate jurisdiction of the federal court, practically denied, or at least neglected to observe the rule. But so far as I can discover, that court has, in its nullification of laws and rules of decision confined itself to this single question of appellate jurisdiction. I will presently refer to the Georgia cases. We shall find, I think' that their resistance first sprang from a jealousy of what was a supposed interference with the peculiar institutions of the state.

The doctrine I am contending for was acted on in King vs. Inhabitants of North Nibley, 5 Term Rep., 21; King vs. Inhabitants of Corsham, 2 East., 303; Hammond vs. Anderson, 4 Bos. & Puller, 69. In the latter case, Sir James Mansfield, Ch. J. said: "It is of greater consequence that the law should be as uniform as possible than that the equitable claims of an individual should be attended to."

In Nelson vs. Allen & Harris, 1 Yerger (Tenn.) Rep. 376, Whyte, J., in delivering the opinion of the court upon the construction of an act of Assembly, held the following language: "Whatever might be my own opinion upon this question, not to assent to its settlement now, after two solemn decisions of this court, the last made upwards of fourteen years ago, and not only no opposing decision, but no attempt even by any case during all this time, to call the point again into controversy, forming a complete acquiescence, would be, at the least, inconsistent, perhaps mischievous, and uncalled for by a correct discharge of official duty. Much respect has always been paid to the contemporaneous construction of statutes, and a forbidding caution hath always accompanied any approach towards unsettling it, dictated, no doubt, by easily foreseen consequences attending the sudden change of a rule of property, necessarily introductory at the least of confusion, increased litigation, and the disturbance of the peace of society. The most able judges, and the greatest names on the bench have held this view of the subject, and expressed themselves to that effect, either tacitly or openly, intimating that if they had held a part in the first construction they would have been of a different opinion; but the construction being made they gave their assent thereto."

Spafford, J., in State vs. Thompson, 10 La. Ann. Rep. 123, said: "Whatever might be our impression were the matter *res integra*, we deem it important, in the construction of statutes, to adhere to what has been already adjudged. The judicial interpretation be-

comes, as it were, a part of the statute, and should not be changed but for the most cogent reasons."

The supreme court of the United States has, in many instances, followed the spirit of this rule, and in giving construction to the constitution, borrowed aid from contemporaneous exposition. Ogden vs. Sanders, 12 Wheat., 200 ; Stewart vs. Laird, 1 Cranch, 299 ; Martin vs. Hunter's Lessee, 1 Wheat., 304 ; Cohens vs. Virginia, 6 Wheat., 318-421.

"Great Regard," says Lord Coke, "ought in construing a statute, to be paid to the construction which the sages of the law, who lived about the time, or soon after it was made, put upon it; because they were best enabled to judge of the intention of the makers at the time when the law was made." Dwarris on Stat., 693.

Mr. Smith, in his learned work on constitutional and statutory construction in some suggestions as to whether courts of equity are bound by the same rules in the construction of laws as courts of law; alluding to the powers and jurisdiction of courts of equity to mould their decrees according to conscience, and *arbitrium bonum viri*, remarks that it has been a question with enlightened lawyers how far this most liberal description of equitable jurisdiction should be permitted; and whether courts of equity ought not to be in all cases governed by general rules; and after giving the reasons and considerations urged why equity should possess the power of a greater latitude of construction and the evils which might flow from depriving them of such power, proceeds: "But on the other hand, it has been thought that this dreadful evil should be tolerated to avoid a greater; that of rendering judges arbitrary, and their decrees so fluctuating that the public could never trust to them as a rule of conduct." Smith on Const. Construct., 583. Farther on, sec. 420, the same author says, that "with decided cases, *starre decisis* is incontrovertibly the maxim of law, and that courts are bound by the positive authority of a solemn determination of the same question by former judges."

The binding force of judicial decisions in the construction of statutes, is well illustrated by the settled rule that, in borrowing the legislation of any other states, we take the law as judicially construed by the courts of the state from whence we borrow at the time. This principle was forcibly applied by Mr. Justice Smith in delivering the opinion of the court in Attorney General vs. Brunst, 3 Wis. Rep., 790, where a construction which had been given by the courts of New York to similar language in the constitution of that state, was made to prevail as the rule of decision here. Our own court but followed what had been frequently and undeviatingly declared by other courts before. Rutland vs. Menden, 1 Pick., 156; Pinnock and Sellers vs. Dialogue, 2 Pet., 1; Campbell vs. Quinlin, 3 Scammon, 153.

Obedience to this principle—the controlling effect of precedent—was given by the supreme court of Ohio in the Piqua Branch of the State Bank of Ohio vs. Jacob Knoup, Tr. of Miami Co., 6 Ohio St. Rep., 342. The court there say upon this precise question of appellate jurisdiction of the federal supreme court : "The jurisdiction here claimed has been constantly exercised by the supreme court of the United States ever since the organization of the general government with the general acquiescence of the state court," and offering no other reason for their ruling, directed the mandate to be entered. Bartley, C. J., dissented, putting forth in his opinion the doctrines of the nullifying extremists of the south, and those which have of late been seized on by the would-be nullificationists of the north.

In a recent case, decided within the present month, Kelley vs. The Jefferson Branch Bank, the same court, in plain terms, affirms the reasoning of its former decision. The opinion of the court by Gholson, J., is reported in the Cincinnati Daily Commercial of February 3. I have seen this case alluded to as though the court had receded from its decision in Piqua Branch Bank vs. Knoup. Not so. The question involved, the right to

tax the banking capital of the state, was one of deep moment. The court had recently in the case of Sandusky City Bank vs. Wilber, 7 Ohio St. Rep., 481, held the law imposing the tax, constitutional; while the supreme court of the United States in Dodge vs. Woolsey, which was an appeal from the circuit court of the United States in the district of Ohio, 18 How., 331, held the reverse by a divided court; and the question was, whether the decision of the supreme court in Dodge vs. Woolsey was binding in the Ohio court as the law of the case at bar. It was held not; that the relation between the two courts was such as that the judgments of the supreme court of the United States in appeals from the federal circuit courts were not absolutely binding upon the state courts, and while fully admitting the appellate jurisdiction in the cases enumerated in the 25th section of the judiciary act, the court declared itself at liberty to ask the supreme court to review its decision in Dodge vs. Woolsey, especially in view of the fact, that on the occasion of the decision of Dodge vs. Woolsey, as is remarked by Gholson, J , in his opinion, " eminent and learned judges of that court expressed their dissent in terms so strong, and sustained by arguments so cogent" against the judgment of the court. He said it was "impossible to regard any doctrine against which such a protest was entered, as settled and established." The court plainly enough concede that had the judgment of the supreme court been pronounced in a case appealed from the state court of Ohio, they would have been bound by it. I have noticed this case thus at length, to correct the impression which, as I before remarked, seems to have gained ground in the newspapers, that it was a recission of former opinions. And to avoid misunderstanding, I may further remark, that the Piqua Branch Bank case, which was an appeal from the state court, and where apparently the same question was involved, arose under a different statute and before the new constitution of Ohio; this, as was held in Sandusky City Bank vs. Wilbur, was deemed to create a new question; and hence, as will be seen, Gholson, J., pays attention to the case of Dodge vs. Woolsey as the only one raising the precise question.

So the supreme court of California in Ferris vs. Coover, 11 California Rep., 175, held in regard to this question that it was too late in the day to question the jurisdiction. The constitutionality of section 25 of the judiciary act of 1789 had been discussed by counsel ; the court say : " We do not propose, nor is is necessary for us to go into an examination of the question so fully and elaborately discussed as to the constitutionality of this section of the act. The argument upon that question has been long since exhausted. The intellects and the various and profound learning of the ablest jurists and statesmen of the Union on one side or the other of this mooted question, have been called in requision, and nothing new could now be said in support of, or in opposition to the validity of this law. It is enough for us to say, that a long course of adjudication by courts of the highest authority, state and national, commencing almost from the foundation of the governments, and the acquiesence of nearly all the state governments, in all their departments have given to this doctrine a recognition so strong and authentic, that we feel no disposition to deny it at this late day, even if the reasons for such denial were more cogent than they seem to us to be. We recognize the rule, that in the exposition of constitutions, as of inferior laws, the solemn, deliberate and long settled precedents of courts and the practice and acquiesence of governments and people should possess controlling weight. With all proper deference to opposing views, it appears to us that a just respect to such high authority ought to conclude the action of courts in favor of the principal so established even where the individual opinions of the judges would be different were the question *res integra.*"

These cases from Ohio and California prove that the application made of the rules contended for to the question under discussion is not a mistaken one. Any number of cases might be added to those already cited, showing the universality of the principle

and the uniformity with which all courts yield in the construction of statutes, their convictions even, to the controlling force of former adjudications on the same subject. I deem it unnecessary. There is no conflict whatever. No lawyer will deny the rule: no wise man can wish it otherwise.

Now, let us see what has been done to warrant the assumption that the courts of the Union are concluded upon the subject. I shall only refer to the judicial exposition which has been given to the constitution and the judiciary act passed under it, giving appellate jurisdiction. At the risk of being tedious in detail as well as matter, I will cite each case by its title and where reported, which has been removed from a state court to the supreme court of the United States. I do this that any one who feels disposed to make the inquiry, may by easy reference to the cases, prove to himself how universal has been the acquiesence on the part of the states in this doctrine of appellate jurisdiction. And let it be borne in mind while looking at the immense array of precedents, that they are not the mere reiteration of the idea, and re-assertion of the jurisdiction by the same tribunal. Let it be remembered that in each case the state court itself was called upon to act; and by its act, has judicially assented to the jurisdiction. I do not assume that it is in all cases absolutely essential that the state courts should judicially assent to the appeal; but I say they have done so with two exceptions—Georgia and Wisconsin. I leave out Virginia; for although at an early day she did dissent, she has since receded from her dogma, and yielded her assent.

The first case removed under the 25th section from a state court, was from Rhode Island, in 1798, Olney vs. Arnold, 3 Dallas, 308. The appellate jurisdiction was, it would seem, taken for granted; as the only jurisdictional question raised was, whether the superior court of Rhode Island was the "highest court" in that state, within the meaning of this act, and held it was.

Then followed Clark vs. Harwood, 3 Dallas, 342, error to the high court of appeals of Maryland; Calder and wife vs. Bull and wife, 3 Dallas, 386; Connecticut; Hallett vs. Boune, 3 Cranch, 210, New York; Gordon vs. Caldcleugh et al., 3 Cranch, 248, South Carolina; Matthews vs. Zane, 5 Cranch, 382, Ohio; Owings vs. Narwood's Lessee, 5 Cranch, 344, Maryland. In none of these cases was the appellate jurisdiction of the supreme court in any wise questioned, other than in some of them the question was made whether the record showed that they came within the act.

Next followed Smith vs. State of Maryland, 6 Cranch, 286, decided in 1810. Here the question was raised by counsel as appears from the reports, but the courts do not notice it in their opinion, seemingly taking it for granted and disposing of the case on the merits.

Then follows Fairfax vs. Hunter, 7 Cranch, 603, where they reversed the judgment of the court of appeals of Virginia. The decision in the state court was pronounced in 1810; reported, 1 Mun., 218; and by that court the record was regularly certified up. No question was made by the Virginia court in 1810, as to the jurisdiction of the federal court; they followed the declaration made by their senate and assembly, which bodies, in February of the same year had, in reply to the proposition of Pennsylvania to so amend the constitution of the United States, as that a separate and independent tribunal might be provided for, to settle conflicts between the state and federal authorities, unanimously resolved that the supreme court of the United States, as then constituted, possessed all the needful jurisdiction, and that they had confidence in its rectitude and impartiality. (See note to Mr. Pinckney's argument in Cohens vs. Virginia, 6 Wheat., 264.) But in 1814, when the mandate from the supreme court came to the court of appeals of Virginia, elements of discord had arisen between New England and the south, anarchical principles, as Mr. Justice Roane, then a member of the Virginia court of ap-

peals, was pleased to term the federal sentiment of New England, were then prevalent at the north ; and this seems to have been the cause of a sudden revolution in feeling and judgment, and what lead to the famous decision by the Virginia court of appeals, in Hunter vs. Martin, 4 Munford, 1, refusing obedience to the mandate of the supreme court in Fairfax vs. Hunter. [The cases are the same : the discrepancy in names occurring from the fact, that the writ of error to the supreme court was obtained by Martin, who was heir at law of Fairfax, deceased.]

In justification of my criticisim upon the judgment of the court of appeals of Virginia, I refer to the report of the case itself. The opinions show that the feeling and prejudice which I have suggested was prevalent ; and besides, they first determine that the case was not one within the judiciary act, which of itself was sufficient reason for their judgment; and then go on *ex industria*, and declare that the supreme court has no appellate jurisdiction in any case. If the first was true the latter declaration was unnecessary ; and could have been put forth only as an "anchor to windward" to guard against any possible future encroachments of the general government, which a revival of "anarchical principles" at the north might suggest and demand.

Of this case it may and ought to be said, however, that the Virginia court treated it as one of first impressions—the question not then having been expressly determined by the supreme court. And it is not unworthy of remark that one of the reasons given why there was no appellate jurisdiction, and why the constitution makers did not intend such, was, that the power and right of legislation over all the subjects embraced in the 25th section of the judiciary act, was exclusive in Congress : and the jurisdiction to determine cases arising under them, exclusive in the federal courts—and hence there could have been no necessity for granting the right of appeal in such cases from the state courts. This reasoning, if nothing else, is pretty effectually upset by the supreme court of Wisconsin in the Booth and Ableman cases.

The same case was again up in the supreme court in 1816, (Martin, heir-at-law of Fairfax vs. Hunter's Lessee, 1 Wheaton, 304,) on the refusal of the court of appeals to obey the mandate in Fairfax vs. Hunter ; and the court unanimously, Mr. Justice Story delivering the opinion, declared the constitutionality of the act of 1789, conferring the appellate jurisdiction, and proceeded under it to pronounce such judgment as the court of appeals of Virginia ought to have done.

Meantime, was the case of Crowell et al. vs. McFaden, 8 Cranch, 94, from Massachusetts, 1814, where no question was raised.

After the case of Martin vs. Hunter, followed the case of Slocum vs. Mayberry, 2 Wheat., 1, from Rhode Island ; Otis vs. Walter, 2 Wheat., 18, Massachusetts; Gelston vs. Hoyt, 3 Wheat., 246, New York , Houston vs. Moore, 3 Wheat., 433, Pennsylvania; Houston vs. Moore, 4 Wheat., 1, Pennsylvania ; McCullock vs. State of Maryland, 4 Wheat.; Dartmouth College vs. Woodward, 4 Wheat., 518, New Hampshire, where the great constitutional question as to the power of a legislature to change or divest chartered rights, was determined, and which has been quoted with approbation by every court in the Union, and over and again recognized as the law of the land ; and F. & Mec. Bank of Pennsylvania vs. Smith, 6 Wheat., 131, Pennsylvania, declaring the unconstitutionality of the state bankrupt law; the principles of which have, ever since the date of the judgment, (1821,) governed the state courts in their decisions, and the states in their legislation.

Next followed, in the same year, (1821,) the case of Cohens vs. Virginia. In this case it appears the court of appeals of Virginia recognized the jurisdiction by making return to the writ of error, though on argument the question was again, and for the last time, discussed. Chief Justice Marshall, who was himself a Virginian born, educated in her

schools, and who had fought her battles in the revolution, and had taken in her public sentiment when the constitution was made, delivered the unanimous opinion of the court affirming the jurisdiction upon principles and considerations independent of and irrespective of any former adjudication, and upon the mere history of the constitution itself, and the very necessity of such a jurisdiction. He said, however, what is not, to say no more, less pertinent now than when he uttered it, that "great weight has always been attached, and very rightly attached, to contemporaneous exposition. No question has arisen to which this principle applies more unequivocally than to that now under consideration." He then refers to the construction given in the "Federalist" to that clause in the constitution supposed to confer the jurisdiction ; to the judiciary act as of itself a contemporaneous exposition, and the circumstance that eminent members of the convention which framed the constitution, were also members of the congress which passed the judiciary act ; and that not a single individual, so far as is known, supposed that part of the act which gives the supreme court appellate jurisdiction over judgments in the state courts, in the cases therein specified, to be unauthorized by the constitution. He then refers to the numerous decisions in the supreme court which had more or less directly affirmed it, and the uniform acquiescence therein, with a single exception, (Virginia,) by the state courts, and concludes :

"This concurrence of statesmen, of legislators, and of judges, in the same construction, may justly inspire some confidence in that construction."

Since this case, the question has never again been raised in the supreme court ; and, from that date, of the twenty-nine states from whence causes have been removed, all, with the exception of Georgia and Wisconsin, if we may call the latter an exception, have acquiesced in the doctrine. Virginia has since had two occasions, and embraced them both, to show her acquiescence.

Phalen vs. Virginia, 8 How., 163 ; and the Richmond Railroad Co. vs. Louisa Railroad, 13 How., 71.

Next in order of time, followed the great case of Gibbons vs. Ogden, 6 Wheat., 448 ; same case, in 8 Wheat., 1 ; the first having been dismissed, for the reason that an appeal was taken before final decree below. This case involved the constitutionality of the steamboat monopoly legislation of New York ; and notwithstanding their courts had all, law and chancery, affirmed the validity of the state legislation, yet, when the supreme court pronounced it unconstitutional, they followed its mandate, and decreed accordingly. Such men as Webster, Wirt, Oakley, and Emmett, appeared as counsel, and no question was made about the jurisdiction.

The following cases cited in chronological order, need no further comment than this : that in all which were entertained as showing jurisdiction on the record, were involved very important questions of law, and the most sacred rights of property were determined by them. They have been acquiesced in and followed, and are every day quoted as evidence of the law and principle which they contain, even by the courts which affect to deny the right to pronounce the decisions. Mathews vs. Zane, 7 Wheat., 164, Ohio ; Buel vs. Vanness, 8 Wheat., 312, Vermont ; Martin vs. Mott, 12 Wheat., 19, New York ; Williams vs. Norris, 12 Wheat., 117, Tennessee ; Montgomery vs. Hernandez, and others, 12 Wheat., 127, Louisiana ; Winn's heirs vs. Jackson and others, 12 Wheat., 135, Kentucky ; Brown vs. State of Maryland, 12 Wheat., 419 ; Hicke et al. vs. Starke et al., 1 Peters, 94, Mississippi ; Ross vs. Doe, 1 Pet., 655, Mississippi ; Wilson et al. vs. Blackbird Creek Min. Co., 2 Pet., 245, Delaware ; Saterlee vs. Mathewson, 2 Pet., 380, Pennsylvania : the celebrated case, drawing the distinction between laws which divested vested rights, and those which impaired the obligation of a contract ; Reynolds vs. McArthur, 2 Pet., 417, Ohio ; Weston et al. vs. City of Charleston, 2 Pet., 449, South Carolina ;

In the matter of Booth.

Sparks et al. vs. Dupont et al., 3 Pet., 242, South Carolina ; Jackson vs. Lamphire, 3 Pet., 280, New York ; Harris vs. Dennie, 3 Pet., 298, Massachusetts ; Lagrange vs. Chouteau, 4 Pet., 287, Missouri ; Craig vs. State of Missouri, 4 Pet., 411 ; Providence Bank vs. Billings et al., 4 Pet., 514 Rhode Island ; Lessee of Fisher vs. Cockerell, 5 Pet., 248, Kentucky ; Menard vs. Aspesia, 5 Pet., 505, Missouri ; Davis vs. Packard et al., 6 Pet., 45 New York.

The next cases were Worcester vs. the State of Georgia, and Butler vs. State of Georgia, 6 Peters, 515 and 597, where the supreme court of Georgia refused to certify the records, and afterwards, as we are told, though there is no reported decision to that effect, refused to obey the mandates upon the judgments of the supreme court of the United States, reversing the judgments of the state court. They were criminal cases. Worcester and Butler had been convicted under the statutes of Georgia, for preaching the gospel to the Cherokee Indians, to which they had been commissioned by the Am. Board of Missions, having obtained thereto the consent of the Commissioners of Indian Affairs, at Washington. The statute of Georgia required all *white* persons dwelling within the Indian country, first to obtain a license from the Governor, and to take an oath to support the constitution and laws of the state of Georgia. The supreme court entertained jurisdiction, the general question not being discussed, but only that which related to the sufficiency of the certificate to the record, and reversed the judgments, holding that the state had no jurisdiction to legislate in the premises. The Georgia statutes are quoted at length in the report.

These are the cases to which I referred above, when I said that Georgia's resistance to the appellate juridiction of the supreme court first sprung from jealousy of interferance with the "peculiar institution." I thought I could refer to more accurate proof than traditional history of that controversy. I cannot, at present, and must content myself with referring to the statutes themselves. I think they sufficiently refute the idea that the motive of the law was not alone—as expressed in its preamble—to protect the *gold mines*. And I think I shall be borne out by the memories of those who remember the controversy, that the legislation of Georgia on that occasion, although ostensibly for another purpose, was in fact to prevent the civilization and christianizing of the Cherokee Indians, whom, than to prevent which, they could not otherwise enslave and make subservient to the propagation of slaves. Read the law.

It may be asked why I dwell so much on these dissenting cases. I will answer. To show that there has been no dissent, except in cases where there has been some local prejudice or demand so overweening, or some political necessities so pressing, as that one or the other has set at naught good principle, and all law and precedent.

In a more recent case, Paddleford vs. Mayor, &c., of Savanah, 14 Georgia Rep , 438, (I have seen but a digest reference, 14 U. S. Dig., 112), the supreme court of that state is reported to have declared, in *obiter dicta*, against the appellate jurisdiction of the supreme court of the U. S. It is a sufficient comment on the judgment of the court, to say that in the same opinion they declared that "no private person has a right to complain by suit in court, on the ground of a breach of the constitution of the United States ; for, though the constitution is a compact, he is not a party to it." I think that even those persons who are most clamorous for the right of denying an appeal, and who cite Georgia as a precedent, would hardly take its whole doctrine ; that there are some guaranties of individual right in our constitution which they would not be willing to surrender, even at the price of depriving the supreme court of jurisdiction, in appeals from the state courts. But enough of digression, and to renew citations.

Wallace vs. Parker, 6 Pet., 680, Ohio ; Sampyrac et al., vs. U. S., 7 Pet., 222, Arkansas; 1833 ; Barron vs. Baltimore, 7 Pet., 243, Maryland ; Davis vs. Packard et al., 7 Pet., 276,

In the matter of Booth.

New York; Byrne vs. State of Mo., 8 Pet., 40. Watson et el., vs. Mercer, 8 Pet., 88, Pennsylvania; Briscoe vs. the Com. Bank of Kentucky, 8 Pet., 118; Davis vs. Packard, 8 Pet., 312, New York; City of New Orleans vs. Armas, 9 Pet., 224, Louisiana; Kern vs Clark, 10 Pet., 291, Louisiana; Crewell vs. Randall and Shoemaker vs. Randall, (disposed of together,) 10 Pet., 369, Delaware; McBride vs. Hoey, 11 Pet., 167, Pennsylvania; Briscoe vs. Bank of Com., of Kentucky, 11 Pet., 257, Kentucky; the latter determining what were bills of credit within the meaning of the constitution of the U. S. McKinney et al., vs. Carroll, 11 Pet., 66, Kentucky; Chas. River Bridge vs. Warren Bridge, 11 Pet., 420, Massachusetts; Beaston vs Farmers Bank of Delaware, 12 Pet., 102, Maryland; Chouteau vs. Margurite, 12 Pet., 507, Missouri; Lessee of Reed vs. Marsh, 13 Pet., 153, Ohio; Ocean Insurance Company ys. Polleys, 13 Pet., 157, Maine; Heirs of Gunnerson vs. Hall, 13 Pet., 409, Louisiana; Wilcox vs. Jackson, 13 Pet., 498, Illinois; Mitchell vs. Lennox, 14 Pet., 49, New York; Commercial Bank, Kentucky vs. Griffith, 14 Pet., 56, Missouri; Lessee of Pollard's heirs vs. Kibbe, 14 Pet.. 354, Alabama; Holmes vs. Jennison, et al., 14 Peters, 540, Vermont; Gordon vs. Longest, 16 Pet., 97, Kentucky; Fulton et al., vs. McAffee, 16 Pet., 149, Mississippi; City of Mobile vs. Hallet, 16 Pet., 261, Alabama; Armstrong vs. Tr of Athens Co., 16 Pet., 281, Ohio; Dobbins vs. Commissioners of Erie Co., 16 Pet., 435, Pennsylvania; Mills vs. Brown, 16 Pet., 525, Illinois; Prigg vs. Pennsylvania, 16 Pet., 541, Pennsylvania; City of Mobile vs. Emanuel, 1 How., 95, Alabama; Chouteau vs. Eckhart, 2 How., 344, Missouri; Ladiza vs. Roland, et al., 2 How., 581; Pollard's Lessee vs. Files, 2 How., 591, Alabama; Barry vs. Gamble, 3 How., 32, Missouri; Gordon vs. Appeal Tax Court and Chester vs. the same, 3 How., 133, Maryland; Pollard's Lessee vs. Hogan, 3 How., 212, Alabama; State of Maryland vs. Baltimore and Ohio R. R. Co., 3 How., 534, Maryland; Permoli vs. First Municipality, 3 How., 589, Louisiana; Burn's Lessee vs. Clements, 3 How., 650; Brown et al., vs. Hunt, 3 How., 673, Alabama; McDonough vs. Millanden et al., 3 How., 694, Louisiana; Neil, Moore & Co, vs. State of Ohio, 3 How., 720, Ohio; Spaulding vs. State of New York, 2 How., 66 and 4 How., 21, New York; Maney et al., vs. Porter, 4 How., 55, Tennessee; Jordon et al., vs. Barret et al., 4 How., 169; McKay et al., vs. Dillon, 4 How., 421, Missouri; Dennis vs. Scott, 4 How., 500, Louisiana; Pepper et al., vs. Dunlop et al., 5 How., 51, Louisiana; Walker vs. Taylor et al., 5 How., 64, Kentucky; Commercial Bank of Cincinnati vs. Buckingham's Ex'rs, 5 How., 317, Ohio; Scott et al, vs. Jones, 5 How., 343, Michigan; Fox vs. State of Ohio, 5 How., 411, Ohio; The Massachusetts.License cases, three in number, 5 How., 404 and onward; Collier vs. Strassbrough, 6 How., 14 Louisiana; Planters's Bank vs. Sharp and Baldwin vs. Payne, disposed of together, 6 How., 301, Mississippi; Houston vs. City of New Orleans, 6 How., 486, Louisiana; The West River Bridge cases, two in number, 6 How., 507, Vermont; Erwin vs. Lowry, 7 How., 172, Louisiana; Matheson vs. Branch Bank Mobile, 7 How., 260, Alabama; Mace vs. Wells, 7 How, 273, Vermont; Crawford vs. Branch Bank Mobile, 7 How., 270, Alabama; The city of Boston Passenger cases, 7 How., 283, Massachusetts; Kenedy's Ex'rs vs. Hunt's Lessee, 7 How., 586, Alabama; Peck vs. Jenness, 7 How., 586, New Hampshire; the latter case settling in favor of the state, the celebrated conflict between the state and federal court, upon the ground that the state court had first obtained jurisdiction over the property, and establishing the doctrine which was urged here against our state court in the Booth cases. Smith vs. Hunter et al., 7 How., 738, Ohio; Udell et al., vs. Davidson, 7 How., 769, Illinois; Neilson vs. Lagow, 7 How., 772, Indiana; Nathan vs. Louisiana, 8 How., 73, Louisiana; Phalen vs. Virginia, 8 How., 163, Virginia; Marsh vs. Brooks, 8 How., 223, Iowa; Mager vs. Grimes, 8 How., 490, Louisiana; Mills vs. St. Clair County, 8 How., 569, Illinois; City of Mobile, vs. Esbana, 16 Pet., 234, Alabama; Almonester vs. Kenton, 9 How., 1 Louisiana; Stradle vs. Baldwin, 9 How., 267, Ohio; Davis vs. Police Jury of Concordia,

In the matter of Booth.

9 How., 280, Louisiana ; Lythe vs. State of Arkansas, 9 How., 314, Arkansas ; Doe vs. Eslava, 9 How., 521, Doe vs. City of Mobile, 9 How., 451, Goodtitle vs. Kibbe, 9 How., 471, Alabama ; Stradee et al., vs. Graham, 10 How., 82, Kentucky ; Woodruff vs. Tratnall, 10 How., 190 ; Paup et al , vs. Drew, 10 How., 218 ; Trigg et al., vs. Drew, 10 How., 224, Arkansas : Henderson vs. Tenn., 10 How., 211, Tennessee ; Philadelphia & W. Railroad, vs. Maryland, 10 How., 377 ; Baltimore & Susq. Railroad, vs. Nesbitt, 10 How., 395, Maryland ; Butler vs. Pennsylvania, 10 How., 502, Pennsylvania ; East Hartford vs. Hartford Bridge Co., 10 How., 511, Connecticut ; Blanc vs. Lafayette, 11 How., 104, Louisiana ; Leager vs. DeYoung, 11 How , 185, Texas ; Brooks vs. Morris, 11 How., 204, Louisiana ; Clements vs. Berry, 11 How., 398, Tennessee ; Webster vs. Reid, 11 How., 439, Iowa ; Gill vs. Oliver's Exrs., 11 How., 529, Maryland ; Miners Bank vs. State of Iowa, 12 How., 1, Iowa : Lessierer et al., vs. Price, 12 How., 60, Missouri : Neilson vs. Lagow, 12 How., 98, Indiana ; Williams vs. Oliver, 12 How., 112, Maryland ; same vs. same, 12 How., 123, The Grand Gulf Railroad & B. Co. vs. Marshall, 12 How , 165, Louisiana ; Teal vs. Felton, 12 How., 284, New York ; Achison vs. Huddleson, 12 How., 293, Maryland ; Cooley vs. Philadelphia, 12 How., 299, Pennsylvania ; Linton vs. Stanton, 12 How., 223, Louisiana ; Darrington vs. Bank of Alabama, 13 How., 12 ; Doe vs. Beebe et al., 13 How., 25, Alabama ; The Richmond R. R. Co., vs. Louisa R. R. Co., 13 How., 71, Virginia ; Campbell et al., vs. Doe, 13 How., 244, Ohio ; Moore vs. Illinois, 14 How., 13, Illinois ; Kassoorer vs. Martin, 14 How., 28, New York ; Lawler vs. Walker, 14 How., 149, Ohio ; Calkins & Co. vs. Cocke, 14 How., 227, Texas ; Trustees of Vinncennes University vs. Indiana, 14 How., 269, Indiana ; Cunningham vs. Ashley, 14 How., 377, Arkansas.

Veazie et al. vs. Moore, 14 How., 568, Maine ; Kanouse vs. Hartin, 15 How., 198, New York ; Curran vs. Arkansas, 15 How., 304, Arkansas ; Walworth vs. Kneeland, 15 How., 348, WISCONSIN ; Carter vs. Bennett, 15 How., 454, Florida ; Foley vs. Harrison, 15 How., 433, Louisiana ; Delauriere vs. Emison, 15 How., 525, Missouri ; McCabe vs. Worthington, 16 How., 86, Missouri ; Burges vs. Gray, 16 How , 48, Missouri ; Robertson vs. Coultoe, 16 How., 106, Mississippi ; State Bank of O. vs. Knoop, 16 How., 369 ; Ohio L, Ins. T. Co. vs. Debolt, 16 How., 416, Ohio ; Gamach vs. Piquignot, 16 How., 452, Missouri ; Poydras de la Landes vs. Treasurer of Louisiana, 17 How., 1, Louisiana ; Haydel vs. Dufresue, 17 How., 23, Louisiana ; Carpenter vs. Pennsylvania, 17 How., 456, Pennsylvania ; Kissell vs. St. Louis Public Schools, 18 How., 19, Missouri ; Bush vs. Cooper's Adm's, 18 How., 82, Missouri ; Verden vs. Coleman, 18 How., 86, Indiana ; Mintee vs. Cromentive, 18 How., 87, Alabama ; Haue vs. State of Missouri, 18 How., 126 ; Calcote vs. Stanton, 18 How., 243, Mississippi ; Mech. and Trader's Bank vs. Debolt, 18 How., 380 Ohio ; Maxwell vs. Newbould, 18 How., 511, Michigan ; Conner et al. vs. Elliott et al., 18 How., 591 ; Schaffee vs. Scuddy, 19 How., 16 ; Corwin vs. Blanc's Executors, 19 How., 202, Louisiania ; Walton vs. Colton, 19 How., 355, Tennessee ; Fellows vs. Blacksmith, 19 How., 366, New York ; Michigan Cen. Railroad Company vs. Michigan South. Railroad Company, 19 How., 378, Michigan ; Bucke vs. Gaines, 19 How., 388 ; Wynne vs. Morris, 20 How., 3 ; Garland vs. Wynn, 20 How., 6, Arkansas ; Christ Church vs. Philadelphia, 20 How., 26, Pennsylvania ; Withers vs. Buckley, 20 How., 84, Mississippi ; Gazzam vs. Lessee of Phillips, 20 How., 372, Alabama ; Marks vs. Dickson, 20 How., 501, Louisiana ; Moreland vs. Page, 20 How., 522, . Iowa ; Beers vs. Arkansas. Platenius vs. Arkansas, same vs. same, three cases, 20 How., 527, Arkansas ; Taylor vs. Carryl, 20 How , 584, Pennsylvania ; Morehouse vs. Phelps, 21 How., 294, Illinois ; State of New York vs. Dibble, 21 How., 366, New York ; Easton vs. Salisbury, 21 How., 426, Missouri.

Then followed the cases of Ableman vs. Booth, and United States vs. Booth, from Wisconsin, reported in 21 How., 506. The record in the former was certified in the usual manner by the clerk of the supreme court, with the assent and by the direction of the ·

court, the Chief Justice himself—the lamented Whiton—in fact, certifying to its authenticity. It would seem the court did not at that time entertain any doubt about the appellate jurisdiction. Subsequently, when the case of U. S. vs. Booth came under consideration, the court made an order directing the clerk not to make return to the writ of error This was in February, 1857. Afterwards, in the month of August of the same year, the clerk of the supreme court, with the express assent of the Chief Justice, made return to a writ of error from the supreme court of the United States, in the case of Dillingham vs. Fisher, which is undetermined. We have these three cases in Wisconsin, where returns have been made with the assent and concurrence of the courts.

It will be seen that there are upwards of *two hundred and twenty* cases which have been removed from state courts to the supreme court of the United States. They have been as follows : From Rhode Island 3; Maryland 16; Connecticut 2; New York 17; South Carolina 3; Ohio 16; Virginia 5; Massachusetts 13; Pennsylvania 13; New Hampshire 2; Vermont 4; Tennessee 5; Louisiana 28; Mississippi 8; Delaware 3; Missouri 17; Kentucky 8; Georgia 2; Arkansas 11; Maine 2; Illinois 6; Alabama 19; Michigan 3; Indiana 4; Texas 2; Iowa 4; Wisconsin 4; Florida 2.

Of these sixty-five have been dismissed, as not coming within the act of Congress; sixty-eight have been reversed; and the judgments of reversal acquiesced in, in all *it is believed,* except the cases from Georgia, and the Booth case from Wisconsin. In the remainder of the cases the judgments of the state courts were affirmed.

In some allusions to the recent case of State vs. Tyler, in the supreme court of Michigan, the assertion is made that that court had denied the appellate power of the supreme court of the United States. This is untrue. No such question arose, and no opinion was expressed, or the slightest reference made to the subject.

This article is more voluminous than I had supposed it would be, but I trust it may not prove entirely valueless.

NOTE.—Mr. Justice COLE having filed no opinion in this case, the following note has been compiled and rewritten by the acting reporter, from sundry articles which appeared in the *Free Democrat,* about the time of the filing the opinion in this case :

The question in relation to the power of the courts of the United States, as being over and superior to the courts of the several states of this Union, and as to the effects and final end of that power, whether the latter shall succumb and become in all things obedient to the former, or whether the state courts are co-ordinate and co-equal with those of the United States, and both entitled to give construction and finally to adjudicate upon the constitution of the United States, have again return before the people of Wisconsin with redoubled interest, by the mandate of the supreme court of the United States, commanding the supreme court of Wisconsin to reverse its well considered adjudications, and to return a citizen of the state, who has been released by the latter court into confinement by a subordinate court of the United States. The question is above and beyond the rights of the individual man. It is a question of the sovereignty, within the constitution of the United States, of the "free and independent states" of this Union; whether their sovereignty shall bow before the overshadowing power of Congress, and the courts of the federal government; of a guaranty " to every state in this Union" of " a republican form of government," or a loss of that guaranty, and the usurpation by Congress of all legislative power, and of the courts of the United States, of all judicial power. It is a question whether the provision of the constitution that, "the powers not delegated to

the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively," is to have any force, or to become inoperative and void.

Hitherto the disposition has prevailed, especially in the Eastern States, to acknowledge the dicta of the supreme court of the United States, as conclusive of all constitutional questions which have arisen before the courts. But the binding effect of these decisions has never been admitted in Virginia, Martin vs. Hunter, 4 Mumf., 1, it has always been repudiated by Georgia, State vs. Woscester, 14 Geo., and has lately been questioned by other states. So the supreme court of Ohio, but a few days ago, refused to follow the decision of the supreme court of the United States, in giving construction to the laws of Ohio, and very recently the California supreme court refused to allow a writ of error from their judgment to the supreme court of the United States. Ferris vs. Coover, 11 California, 175.

The consideration of this question of jurisdiction is one of vast importance to all the states, and to every man in the states; but to none more than to the people of Wisconsin. Here the people have secured their rights by providing in their constitution, that "writs of error shall never be prohibited by law" But if the power claimed by the district court of the United States, to hold jurisdiction of cases where the amount in less than $2,000, is to prevail as the law of Wisconsin, then as to all such cases, the salutary provision of our constitution is nugatory. And the same is true as to all criminal cases tried in that court. The truth of these statements will not be denied, and therefore need no citations to establish them. The opinions of the supreme court of the United States, plainly show that the idea, if not the claim of power, heretofore insisted on, is fast passing away, even from that august and somewhat grasping tribunal.

In giving his opinion in the Dred Scott case, Wayne, Justice, said : "The differences between the rules concerning pleas to the jurisdiction in the courts of the United States, and common law courts have been stated and sustained by reasoning, and adjudged cases; and it has been shown that writs of error to a state court and to the circuit courts of the United States are to be determined by different laws and principles. In the first, it is our duty to ascertain if this court has jurisdiciion, under the 25th section of the judiciary act, to review the case from the state court; and *if it* shall be found that it has not, the case is at an end, so far as this court is concerned; for our power to review the case upon its merits has been made by the 25th section to depend upon its having jurisdiction; when it has not, this court cannot criticise, controvert, or give any opinion upon the merits of a case brought to this court from a state court." 19 Howard, 455.

And Justice Daniels, speaking to the same point, page 472, says: "It would seem to follow conclusively from the peculiar character of the courts of the United States, as organized under the constitution and statutes, and as defined by numerous and unvarying adjudications from this bench, and there is not one of those courts whose jurisdiction and powers can be deduced from mere custom or tradition; not one whose jurisdiction and powers must not be traced palpably to, and invested exclusively by, the constitution and statutes of the United States; not one that is not bound therefore at all times and at all stages of its proceedings, to look to and to regard the special and declared extents and bounds of its mission and authority. There is no such tribunal of the United States as a court of *general jurisdiction*, in the sense in which that phrase is applied to the superior courts under the common law."

Ours is a system of governments, compounded of the separate governments of the several states composing the union, and of one common government of all its members, called the government of the United States. The states preceded the common government, which was created by them. They are all framed by written constitutions; those of the several states by the people of each, acting separately, and in their sovereign char-

acter; and that of the United States by the same people acting in the same character, but jointly. They all divide the powers of government into legislative, executive and judicial, and are founded on the great principle of the responsibility of the rulers to the ruled. The entire powers of government are divided between the two; those of a mere general character being specially delegated to the United States, and all others not delegated "reserved to the several states" in their separate character. Each within its appropriate sphere, possesses all the attributes and performs all the functions of government. Neither is perfect without the other. The two combined, form one entire and perfect government.

The above are the axioms laid down by Mr. Calhoun in his treatise "on the Constitution and the Government of the United States," and we believe they will not be controverted or denied by any one. Standing on these as a foundation, we proceed to inquire into the powers of the government of the United States, with reference to the powers of their courts. Before doing so, it is important to examine a little further into the nature of the powers of the government, in its several departments.

The United States government was formed by the constitution, and has no existence independent of or outside of that instrument. It is a democratic federal government.

It is democratic, as contradistinguished from aristocratic and monarchic. It excludes classes, orders and artificial distinctions among its citizens. The great fundamental principle, the cardinal maxim of the government is, that the people are the primary source of all power; that the governments of the several states and of the United States are created by them and for them. And so far as the government of the United States is concerned, the powers not delegated to it, are reserved to the States or the people.

The government of the United States is also federal as well as democratic. It is federal not national, because it is the government of states, joined in a political union; not of individual men socially united, by what is called a social compact. To express it in other words: it is federal and not national, because it is the government of a community of states, and not the government of a single state or nation, like France or Russia. Hence we think those greatly err, who speak of this government as "the National government," or of any of its departments as "national," as the "national legislature," "the national executive," or the "national courts." To this source may be traced in a great measure the idea which we shall endeavor to remove or correct, of the supremacy of the courts of the United States over those of the several states. To the same source may be traced the cry of national and sectional parties. The invocation of certain states to extend the protection of the United States police regulations, within the limits of their states, in relation to local matters, has its origin here. So also, here is found the foundations for many of the acts of Congress, the constitutionality of which has been denied by the state courts, or condemned by state legislatures and private citizens, or whose policy has been questioned by the wisest and best among us.

That it is federal, not national, is shown by the high authority of the convention which framed the constitution. Gen. Washington as its organ, in his letter submitting it to the consideration of the congress of the then confederacy, calls it "the general government of the Union," "the federal government of these states." These expressions were not used without due consideration, and an accurate and full knowledge of their true import and meaning. The subject was not a novel one. It was familiar to the convention. At an early stage of their proceedings they had divided upon it. One party was in favor of a national and the other of a federal government. The former at the beginning prevailed, and their plans for a constitution styled it "National." But finally the term was superceded, and the "United States" substituted in in its place. The constitution is therefore styled "The Constitution of the United States of America," and the government

"The Government of the United States." It is thus clear that the convention regarded the different expressions, "the federal government of these states," the "general government of the Union," and "the government of the United States," as meaning one and the same thing a federal, in contradistinction to a national government.

The phrase was a familiar one. The instrument which formed the confederacy, was styled "Articles of confederation and perpetual Union," and it styled the confederacy "The United States of America." It declared that "each state retained its sovereignty, freedom and indepence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States in Congress assembled." Such was the style of the revolutionary government. So the Declaration of Independence called itself, "The unanimous declaration of the thirteen United States of America," and it declared "that these United Colonies are, and of right ought to be free and independent states," "and that as free and independent states, they have full power," &c., "and to do other acts and things which independent states may of right do," "THE UNITED STATES" is then, their baptismal name. And it would seem that no doubt is left that they are, what they are expressly declared to be, "free, independent and sovereign states," united simply as confederated states, and not a national government, superior to and above the state governments.

Having shown that the government of the United States was a federal and not a national government; not a nation in the sense in which that word is understood in Europe, or among and by many of the politicians of this continent, but a confederacy of states, joined together by the Constitution; we shall now proceed to examine particularly into the power given by that instrument, to the courts of the United States as that power affects the state courts. In doing this we must not forget Art. X. of the Amendments, "the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

Art. III. sec. 1, of the Constitution provides that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish," and section 2 provides, "The judicial power shall extend (1) to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made under their authority; (2) to all cases affecting ambassadors, other public ministers and consuls; (3) to all cases of admiralty and maratime jurisdiction; (4) to controversies to which the United States shall be a party; (5) to controversies between two or more states; [between a state and a citizen of another state]; (6) between citizens of different states; (7) between citizens of the same state claiming lands under grants of different states; (8) and between a state, or the citizens thereof, and foreign states. and citizens or subjects.

Here will be observed eight distinct classes of cases, over which the courts of the United States have jurisdiction. The words included in brackets were repealed by Article XI. of Amendments. But the Constitution does not here[declare that the power is exclusive.

The second clause of the same section, next provides that, "in all cases affecting ambassadors, other public ministers, and consuls; and those in which a state shall be a party, the supreme court shall have original jurisdiction. In all the other cases before mentioned, the supreme court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the congress shall make."

This last clause is worthy of careful examination, and requires to be often referred to. At present we shall only call attention to the fact, that it has excepted the 2d, and 5th classes of actions mentioned in the first clause of the section; and in them it has given original jurisdiction to the supreme court; that is the suit in these cases must be first commenced in that court, and not in some other court of the United States. In the 1st,

3d, 4th, 6th, 7th, and 8th classes, the power of the supreme court is always appellate, and that power is further limited by " such exceptions and under such regulations as the congress shall make." In all of these classes the courts of all the states have claimed and exercised jurisdiction concurrent with the courts of the United States, except in the 4th' " controversies to which the United States shall be a party." Hence we argue that in these cases the courts of the United States do not by this article of the constitution possess the exclusive jurisdiction to determine these classes of cases ; and if it exists at all, it exists in the acts of Congress.

There is but one other clause of the constitution which will demand our notice, as relating to the judicial power, and that is Article VI., section 2, and without quoting it here, we will say, that in our opinion it confers no power on the supreme court of the United States; but is confined in its operation, exclusively to the state tribunals.

The power of the supreme and other courts of the United States, by the constitution, is confined to two classes, in which the supreme court has original jurisdiction, and six in which it has only appellate jurisdiction. The appellate power is restricted in two directions. 1. It must be in one of the cases mentioned in the first clause of section 2, Article III. 2. It must be "with such exceptions, and under such regulations as the Congress shall make." Then it is plainly manifest that an act of Congress was necessary to set the appellate power in motion, and it was not set in force by its own intrinsic power· This act was passed at the first session of the Congress of the United States, by an act approved September 21, 1798, chapter 20, "An act to establish the judicial courts of the United States."

Section one of this act fixed the number of the judges of the supreme court, with a chief justice and five associates. Section two divided the whole United States into thirteen circuits, to which, in 1790-91, three others were added. Section three established the district courts in each of the circuits, and provided for the appointment of the judges, and the terms of their courts. Sections 4, 5, and 6, related to the term of the circuit courts, held by the district judges, and a judge of the supreme court, and sections 7 and 8 to the appointment of the clerk of the court, and the oaths of offices of the judges.

This oath is so singular that we give it at length, first premising that the oath of office in Wisconsin to all officers, no matter what, or for what he may be appointed, is fixed by our constitution, and, it will be remembered, is in these words, " I will SUPPORT THE CONSTITUTION *of the United States,* and the' constitution of the State of Wisconsin, and faithfully discharge the duties," &c. Not so, the oath required of these judges, for whom is claimed all final judicial wisdom. These United States judges swear thus : " I, A B, do solemnly swear, or affirm, that I will administer justice without respect to persons, do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent on me, as ———— according to the best of my abilities and understanding, AGREEABLY to the constitution and laws of the United States, so help me God." Here is no oath of office enjoining these judges to declare that the constitution of the United States is the supreme law of the land; no oath requiring them to declare, or see that Congress passes no unconstitutional act; but on the contrary, they are to perform their duty "agreeably to the constitution and laws;" thus making the laws of Congress, or their enactments, co-equal with the constitution. Is it a wonderful thing that judges who have taken such an oath of office, and no other, should never have declared an enactment of Congress void ? or that General Jackson, who had taken an oath to support the constitution, should say, " I will support the constitution as I understand it, and not as this supreme court has interpreted it for me ?"

Section 9 and 10 give the original jurisdiction to district courts, and section 11 to the circuit courts. Section 12 relates to the removal of cases from the state courts to the

In the matter of Booth.

circuit courts of the United States. Section 13 relates to the exclusive jurisdiction of the supreme court. Section 14 relates to, and gives the power to issue writs. Sections 15 to 20 relate to the trial of causes in the courts of law and equity. Sections 21 and 22 provide for appeals from the district to the circuit courts, and from the circuit to the supreme court, "where the matter in dispute exceeds the sum or value of two thousand dollars, exclusive of costs." Sections 23 and 24 relate to the proceedings upon appeals and writs of error. This brings us to the famous 25th section under which the power the sole power, is claimed for removing causes from the state courts to the supreme court of the United States.

This section is so singular in its provisions, so comprehensive in its scope and meaning, and yet so unjust in its restrictions and requirements, that it should not only be read, cut out, and preserved, but placed and printed in all books containing copies of the state constitutions, as forming part and parcel of the judiciary article of the constitutions, if the opinion is to prevail as the law, that the supreme court is to be the final arbiter of the constitutionality of all acts and decisions of the state legislatures and state courts. Then men will at all times be able to see and know what is the supreme law of the land, the *ultima thule* of constitutional law. Without it they have but one-half of it before them.

"Section 25. That a final judgment or decree in any suit in the highest court of law or equity of a state in which a decision in the suit could be had, where is drawn in question the validity of a treaty, or statute of, or an authority exercised under the United States, and the decision is against their validity; or where is drawn in question the validity of a statute, or an authority exercised under any state, on the ground of their being repugnant to the constitution, treaties, or laws of the United States, and the decision is in favor of such validity: or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under, the United States, and the decision is against the title, right, privilege, or exemption, specially set up or claimed by either party, under such clause of the said constitution, treaty, statute, or commission, may be re-examined and reversed or affirmed in the supreme court of the United States, upon a writ of error, the citation being signed by the chief justice, or judge, or chancellor of the court rendering or passing the judgment or decree complained of, or by a justice of the supreme court of the United States, in the same manner, and under the same regulations, and the writ shall have the same effect as if the judgment or decree complained of had been rendered or passed in a circuit court; and the proceedings upon the reversal shall also be the same, except that the supreme court, instead of remanding the cause for final decision, as before provided, may, at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution. But no other error shall be assigned or regarded as a ground of reversal, in any case as aforesaid, than such as appears on the face of the record, and immediately respects the before-mentioned questions of validity or construction of the said constituion, treaties, statutes, commissions or authorities in dispute."

There is the whole of the power of the supreme court, and we now ask the reflecting to pause, to read and reflect; to mark the extent of the power claimed, and then turn over the constitution of the United States, and mark from whence these powers are derived, if perchance they shall be more fortunate than we have been, in finding the power to pass this section, in that instrument; let them also remember, that "an act of Congress cannot invest the supreme court with an authority, not warranted by the constitution." Marbury vs. Madison, 1 Cranch, 137.

There is a class of men among us who will insist, that not only that act is in full force, equal with the constitution of this state, but that it is superior to it ; that it is

"the supreme law of the land;" that "the judges" are "bound thereby, anything in the constitution or laws of any state to the contrary, notwithstanding;" that the constitution, and ultimate decision upon the constitutionality of it, has been committed to men who hold their office beyond and above the reach of the people of any state, and whose oath of office has placed the enactments of the United States upon a par with the constitution itself. Let such pause and consider whether they have adopted this same section, and placed the same in the position of a law of the Medes and Persians, beyond the reach and power of amendment.

If it be " the supreme law;" if it be binding on all "judges in every state, anything in the constitution or laws of the same to the contrary, notwithstanding;" if the sole and final decision upon all the questions and matters embraced in it, is committed to the exclusive jurisdiction of the supreme court of the United States: if that court has the power to compel the state courts to make returns to their mandates, or to " proceed to a final decision of the same, and award execution;" if all these positions be true, then it is high time the people well understood their decisions, that they may, like all law abiding citizens, know by what laws they are governed, and to what courts they are finally accountable.

We now come to an examination of what questions may be carried to this supreme ultimate tribunal, as specified in the act; for we must remember that the constitution has said nothing about any appeal from a state to the federal courts. They are all those decisions " where is drawn in question the validity of the treaty, or statute of, or an authority exercised under the United States, and the decision is against their ability." That is rather a sweeping claim of power! but every clause of it has been sustained by the supreme court of the United States. Under it, they have declared that a treaty made with a tribe of Indians, relating to lands lying within the limits of one of the thirteen original states, overrode and rendered null and void an act of that state; Worcester vs. the State of Georgia, 5 Peters, 175. They have decided that the statutes of states are unconstitutional and void, though those statutes were mere sanatory regulations, New York vs. Miln, 11 Pet., 139; or adopted for purposes of state revenue, McCullock vs. Maryland, 4 Wheat., 316, and many other cases; for the preservation of morals, and suppression of gambling, Cohens vs. Virginia, 6 Wheat., 648; for the promotion of education, Woodward vs. Dartmouth College, 4 Wheat., 518; for the protection and promotion of internal navigation, Gibbon vs. Ogdens, 9 Wheat., 1; they have deprived citizens of states of lands patented to them by the states in which they were citizens, because after the date of their patents, which were made prior to the adoption of the constitution of the United States, a treaty has been concluded with a foreign country, Martin vs. Hunter, 7 Cranch, 603.

Now, suppose that such a stretch of jurisdiction as we have named is given to the court by Congress, in this act, does it from thence follow that the act itself is constitutional, and that a state supreme court is bound by it; or has it the right to look into the authority of Congress to pass the act itself? We say it has, and it is incumbent on those claiming the authority in the supreme court of the United States, after the statement made by Justice Daniels in the Dred Scott case, 19 Howard, 471, to trace the jurisdiction and power in the constitution of the United States. If they cannot find such power there, then they must not charge us with treason if we insist that " the powers not delegated to the United States by the constitution," "are reserved to the states," and to the state courts.

But, if the supreme court of the United States has made such decisions upon the rights of the people, and the state laws under the validity of treaties and statutes of Congress, what may we not expect under the broader phrase, " or an authority exercised under the

United States?" Taney, C. J., gives us an inkling of this power in this very case of Booth, 21 How. Rep , 524, when, speaking of the duty of the marshal of the United States, when served with a writ of *Habeas Corpus*, he says : "It was his duty not to take the prisoner, nor suffer him to be taken before a judge or court upon the *Habeas Corpus* issued under state authority. No state judge, or court, after they are judicially informed that the party is imprisoned under the authority of the United States, has any right to interfere with him. or to require him to be brought before them. And if the authority of a state, in the form of judicial process, or otherwise, should attempt to control the marshal, or other authorized officer or agent of the United States, in any respect, in the custody of his prisoner, it would be his duty to resist it, and call to his aid any force that might be necessary to maintain the authority of law against illegal interference. No judicial process, whatever form it may assume, can have any lawful authority outside of the jurisdiction of that court or judge by whom it is issued ; and an attempt to enforce it beyond these boundaries, is nothing less than lawless violence."

What a claim of power ! Has it come to this, that the writ of *Habeas Corpus* can be suspended by an appointee of the President of the United States, and whenever it shall seem best to him, even to resist it by force ?

We come now to a consideration of the next clauses of this famous 25th section of the Judiciary Act, which has been elevated to a seat superior to the constitution of all the states, and has given the power of appeal from the state to the supreme court of the United States. Those clauses read as follows : " Where is drawn in question the validity of a statute, or an authority exercised under any state, on the ground of their being repugnant to the constitution, *treaties, or laws* of the United States, and the decision is in *favor* of such validity, or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under the United States, and the decision is *against* the title, right, privilege, or exemption, specially set up or claimed," "may be re-examined," &c., "in the supreme court of the United States." We like to repeat the provisions of this "higher law," which we see lifting its head as far above all other laws, above all constitutions, as does the tall pine above the lowly arbutus, overshadowing and robbing the humbler plants of light, nourishment, and life itself. If it is to live and flourish among us, we should know its qualities and requirements ; if not, we should provide for its destruction and overthrow, before its branches fill all the land.

It cannot escape notice, that in these clauses, as well as in the one before, but one of the parties litigant under this act has the right to test the constitutionality or validity of the state authority. In the one case, where the decision of the state is *against* the validity of the state act, there is no remedy, even though the supreme court of the United States may have before decided upon and in favor of the validity of this same state authority. So in the other, where the decision is in *favor* of the validity of an act of Congress, the aggrieved party has no remedy, even though the supreme court should have declared the same act void.

The position will be best, illustrated by a comparison of the case of Menard vs. Aspasia, 5 Peters, 505, with Sanford vs. Dred Scott, 19 How., 393. In the first of these cases the supreme court of Missouri had decided that the ordinance of 1787, declaring that " there shall be neither slavery nor involuntary servitude in said territory," (the territory northwest of the river Ohio,) &c., was valid, notwithstanding the treaty with France; whereas, in the latter case, the supreme court of the United States have declared the same clause null and void, by reason of the same treaty with France. The first was dismissed from the consideration of the court because the state decision was in favor of the act of Congress, while the last declares the act itself null and void.

The single view, that both parties have not the right to bring a writ of error, must, of itself, destroy the whole of the argument used by the supreme court, and its supporters, to maintain its jurisdiction over these classes of cases; that is, its *necessity to produce uniformity of decision and construction.* It must be plain to every one, that the decisions of different state courts may be dissimilar, and we have shown that they have not and cannot be corrected in the courts of the United States.

All state authorities are bound by the constitution of the United States, and all state acts repugnant to it are void; but at the same time, a state constitution, perhaps enacted prior to the existence of the United States, or accepted by Congress, or a state act is not of necessity void because the same may be repugnant to an act of Congress, or a treaty with a foreign country. For it may be that the act of Congress, or the treaty to which the state act is repugnant, may itself be repugnant to the constitution of the United States, and therefore void. Mayburry vs. Madison, 1 Cranch, 37. Unless this be true, we must claim, what few at this day will claim, that Congress, a body of men, the individual members of which are charged with all the crimes of the decalogue, and some not in it, yet in their collective capacity, are possessed not only of all virtues, but of all legal lore and wisdom, and further, of infallibility itself.

In these clauses of the 25th section is found the remarkably sweeping words, " or commission held under the United States, and the decision (of the state court,) is against the title, right, privilege or exemption" " set up." We can scarcely imagine a case which may not be " drawn in question," under a fair construction of this rule, and carried to the supreme court.

The first case carried to the supreme court, under this 25th sec., was Olney vs. Arnold, 3 Dal., 308. Olney, who held "a commission under the United States," as collector of Providence, had assumed to determine upon the goodness of a bond, tendered him to secure the payment of the duties on a cargo of goods, and refused to permit the goods to be landed. For this he was tried in the state court of Rhode Island, and pleaded his "commission." The court on the trial decided that the plea was not well taken, and the case was carried to the supreme court, and the petty officer, with his "commission," is set up above the authority of a sovereign original state, above a state which had refused to ratify the constitution till 1790, objecting to the extent of the judicial power, and was then threatened with coercion and force to compel a ratification. Another feature in this remarkable first case may as well be noticed here as elsewhere; the amount of the judgment was £13 5s, New England currrency; that is $44 16, an amount below the jurisdiction of a justice of the peace

So the case of Palmer vs. Allen, 7 Cranch, 550, was an action of false imprisonment, and plea that the defendant held the " commission under the United States," of marshal of Connecticut, and he had arrested the plaintiff by virtue of his office. This plea was held sufficient by the United States court, though the process was in direct violation of the state law. Our list might be extended to an almost indefinite number, but enough has been given for the present, to show how far this usurpation of power has been carried by that grasping court.

. Look again at the extensive powers here attempted to be conferred upon this supreme court of the United States, covering as it does, "treaties," "statutes," and " authority exercised under the United States," "statutes" and " authority exercised under any state," claimed to be "repugnant to the constitution, treaties or laws of the United States," and also covering the " constitution," " treaties," " statutes," and " commission held under the United States," and the " title, right, privilege or extension specially set up or claimed by either party," under all these provisions, and tell us, if you can, what is left of state courts and state sovereignty ? where is the remnant of " powers not delega-

ted to the United States by the conititution," and "reserved to the states respectively," and without which several of the old states utterly refused to ratify the constitution? Did any one at that time suppose, by the adoption of the constitution, they were setting up a national court, which should reach forth its hand and examine every fruit and market basket, which the good wife happened to carry to market, if by chance she had come in a canal boat, or a "dug out? Jackson vs. Steamboat Magnolia, 20 How., 396. A court that would send its writ of error to a petty borough court, and bring up a case beneath the dignity of the superior courts of the state and on it declare a state act to suppress gambling, a nullity, because it interferred with the sale of tickets within the limits of a sovereign state, issued by a lottery chartered by an act of Congress and located in the District of Columbia, for the benefit of the immaculate members of Congress? Cohens vs. Virginia, 6 Wheat., 265.

If these things have been done when the states were in their pristine vigor, what may we not expect, should the day ever come, when they shall become decrepit from the long continued aggressions, and sapping usurpations of the supreme court of the United States? If the green tree can scarcely resist the blast and storm, what shall support the the girdled, dried up, and root-rotten trunk, soon to be the sole remnant of state jurisdiction? Is there not need of a deliverer and saviour for the states?

We have now shown what causes may be carried to the supreme court of the United States, and have made some allusions to the kind of cases, which have been carried to that court,, and in which that court has taken jurisdiction of the same, as was claimed under this 25th section of the judiciary act. The next point to which we call astention is contained in the clause following those we have just cited, and commented upon, which provides: That the following enumerated cases "may be re-examined and reversed or affirmed in the supreme court of the United States, upon a writ of error, the citation being signed," &c., "in the same manner and under the same regulations, and the writ shall have the same effect, as if the judgment or decree complained of had been rendered or passed in a circuit court, and the proceeding upon the reversal shall also be the same, except that the supreme court instead of remanding the cause for a final decision, as before provided, may, at their discretion, if the cause shall have been once removed before, proceed to a final decision of the same, and award execution."

1. We desire to call attention to the words, "*in the same manner and under the same regulation*" &c., "as if the judgment or decree complained of had been rendered or passed in a circuit court." To an unsophisticated mind, to one seeing this passage for the first time, and not interested to confer, or retain power, or jurisdiction, it must be plain, in fact no other idea would be likely to arise, except that a case carried to the supreme court, must be in the same time, by the same process, with the same bond, if one were repuired, and that the judgment must be for the same amount, as if the cause was taken up from a circuit court. The proper meaning of "manner" and "regulations," sustains this view. This would seem to be the true rule, and each one would ask what cases, and in what "manner" and under what "regulations," may cases be carried from the ciruit to the supreme court of the United States? That question will be answered by citing from the 22d section of the act. "And upon a like process" (that is "upon a writ of error,") "may final judgments and decrees in civil actions, and suits in equity in a circuit court, brought there by original process or removed there from courts of the several states, or removed there by appeal from a district court, where the matter in dispute exceeds the sum or value of two thousand dollars, exclusive of costs, be re examined and reversed or affirmed, in the supreme court." By this provision it will be seen, that all cases were carried from the circuit to the supreme court, "upon a writ of error," and not othewise.

2. But to examine this question of jurisdiction from every stand point, we must here allude to the act of 1803, Sec. 2, which provides that all equity and admiralty cases, (that is cases where the proceedings are not according to the course of the common law,) are to be carried to the supreme court by appeal, and not "*upon a writ of error,*" as was provided in the act of 1789 ; and from the passage of this last act, no equity or admiralty case has been carried to that court from a circuit court, "upon a writ of error." Now we would like to have some man, "learned in the law," or even sophist, tell us by what process of reasoning, he could make it appear, that an equity, or other case in which the proceeding is not according to the course of the common law, can be carried from the supreme court of a state, "upon a writ of error," "in the same manner, and under the same regulations, and the writ to have the same effect, as if the " "decree complained of, had been redered or passed in a circuit court," when there is not and cannot be "a writ of error" issued to the circuit court in such a case. It will not do to say that the old act is not changed, for it is, and it must also be remembered the United States courts are not "courts of general jurisdiction, in the sense in which that phrase is applied to the superior courts under the common law," Sanford vs. Dred Scott, 19 How., 472. No appellate power is conferred upon the supreme court, by the constitution, but its entire jurisdiction depends upon, and its powers must be exercised in the mode prescribed, limited and regulated by the acts of Congress and not otherwise.

3. To repeat : before a case can be carried from a *state court* to the supreme court, the following facts must conspire, not one but all of them : 1. There must be a "final judgment or decree," in a suit. 2. It must be "in the highest court of law or equity," in which a "a decision could be had." 3. "A question " as to the validity of a treaty or statute " &c., of the United States, and "the decision is against the validity ;" or " the validity of a statute," &c., of a state and "the decision is in favor of the validity ;" or the construction of "the constitution, treaty " &c., of the United States, and "the decision is agaisnt the right" &c., "set up or claimed;" and 4, "the matter in dispute must exceed the sum or value of two thousand dollars. Should these facts all conspire, then the case must be carried up ; 1. "upon a writ of error," and 2d it must be, "in the same manner and under the same regulations, and the writ shall have the same effect as if the judgment or decree " "had been rendered or passed by the circuit court." And being so carried up " no other error shall be assigned or regarded as a ground of reversal "except" such as "appears on the face of the record, and immediately respects the before-mentioned questions."

Upon these rules and requisitions, decisions have been made so various, and so contrary to common sense, and the common understanding of mankind, that had they not been made, no one could have believed that a court would have made them. And we must say that we see no way to account for it, but upon the principle of courts grasping for jurisdiction, even to the misconstruction of statutes for the sake of acquiring it.

In Rhode Island vs. Massachusetts, 12 Howard, 721, Justice Daniel giving the decision of the court, said : "It was necessarily left to the legislative power to organize the supreme court, to define its powers consistently with the constitution, as to its original jurisdiction ; and to distribute the residue of the judicial power between this and inferior courts, which it was bound to ordain and establish, defining their respective powers, whether original or appellate, by which and how it should be exercised. In obedience to the injunction of the constitution, congress exercised their power, so far as they thought it necessary and proper, under the 17th clause of the 8th section, first Article for carrying into execution the powers vested by the constitution in the judicial, as well as all other departments and officers of the government of the United States, 3 Wheat., 389. No department could organize itself ; the constitution provided for the organiza-

In the matter of Booth.

tion of the legislative power, and the mode of its exercise, but it delineated only the great outlines of the judicial power, 1 Wheat., 346 ; 4 Wheat., 467 ; leaving the details to congress in whom was vested, by express delegation, the power to pass all laws neces-sary and proper for carrying into execution all powers except their own. The distribution and appropriate exercise of the judicial power, must thereafter be made by laws passed by congress, and cannot be assumed by any other department, else, the power being concurrent in the legislative and judicial departments, a conflict between them would be probable, if not unavoidable."

We have already alluded to the first cause which was carried up, Olney vs. Arnold, from Rhode Island, where the damages and judgment in an action of replevin was but $43 instead of $2,000, the amount necessary to carry a case of the same kind from the cir-cuit courts. No question is made by counsel or by the court upon this want of jurisdic-tion. The two next cases do not inform us what the amount in controversy was. But as they contain points worthy of attention, we cannot forego a desire to examine them in as few words as possible.

In Clarke vs. Harwood, 3 Dal., 342, a writ of error to the court of appeals of Maryland, the question was, whether a paper money payment of a British debt into the treasury of Ma-ryland in 1780, and during the war, by virtue of a law of the state, was a bar to the cred-itor's recovery in 1796. This decision declares that an act passed by the sovereign and "independent state" of Maryland in 1777, confiscating the debts of an alien enemy, was rendered void by reason of the treaty of Great Britain in 1783, and that such treaty be-came a law by virtue of the adoption of the federal constitution, and the case then fell under the 25th section of the judiciary act in 1787. Ware vs. Hylton, id., 199. If this does not strike at the root of state sovereignty we should like to have some person who can, inform us.

Calver vs. Ball was carried to the supreme court the same year from Connecticut, where the legislature had given a right to appeal in a probate case after the statute of limita-tions had barred the appeal. The constitutionality of the act is sustained, and the court says : "It appears a self-evident proposition that the several state legislatures retain all the powers of legislation delegated to them by the state constitutions; which are not ex-pressly taken away by the constitution of the United States." That is our idea exactly. But the court goes on: "The establishing courts of justice, the appointment of judges and the making regulations for the administration of justice within each state, according to its laws, on all subjects not entrusted to the federal government, appears to me to be the peculiar and exclusive province and duty of the state legislatures; all the powers delegated by the people of the United States to the federal government, are defined, and no constructive powers can be exercised by it, and all the powers that remain in the state governments are indefinite." Here is contemporaneous construction. And no language could better cover the whole ground. All we ask is, that we may have the powers of the federal government defined, and nothing constructive; and going on that rule, we say there is no power given to Congress to pass the 25th section of the judiciary act. Another contemporaneous construction was put upon the constitutionality of this act in Respublica vs. Cobbett. The defendant had moved to change the case from the state to the United States court. The motion was denied, and McKean, C. J., of Penn-sylvania, in giving the opinion of the court, says: "The division of power between the national, federal and state government, (all derived from the same source, the authority of the people,) must be collected from the constitution of the United States. Before it was adopted, the several states had absolute and unlimited sovereignty within their re-spective boundaries, of all the powers legislative, executive and judicial, excepting those granted to Congress under the old constitution. They now enjoy them all, excepting

In the matter of Booth.

such as are granted to the government of the United States by the present instrument, and the adopted amendments, which are for particular purposes only. The government of the United States form a part of the government of each state; its jurisdiction extends to the providing for the common defense against exterior injuries and violence, the regulation of commerce, and other matters specially enumerated in the constitution; all other powers remain in the individual states comprehending the interior and other concerns. These combined form one complete government." Stop there and note the remarks upon the limits of jurisdiction and powers of what Chief Justice Taney, in Booth vs. Ableman, calls the "two sovereignties." To us the boundaries here defined are impregnable, based as they are upon the constitution and common sense. But Chief Justice McKean goes on : "Should there be any defect in this form of government, or any collision occur, it cannot be remedied by the sole act of the Congress or of a state. The people must be resorted to for enlargement or modification. If a state should differ with the United States about the construction of them, there is no common umpire but the people, who should adjust the affair by making amendments in the constitutional way, or suffer from the defect. In such a case the constitution of the United States is federal; it is a league or treaty made by the individual states, as one party, and all the states, as another party. There is no provision in the constitution, that in such a case the judges of the supreme court of the United States shall control and be conclusive; neither can Congress by a law confer that power. There appears to be a defect in this matter; it is a casus ommissus which ought in some way to be remedied." "I think the remedy must be found in an amendment of the constitution."

We have copied so extensively from these opinions, because of their date, being made almost contempraneously with the adoption of the constitution; and by men who took active parts in the political contests of those times, and they have been acted upon ever since in Pennsylvania.

These cases are followed soon after by the case of Martin vs. Hunter, which was reversed, and the supreme court of Virginia entered their judgment in 1814, as follows : "The court is unanimously of opinion, that the appellate power of the supreme court of the United States does not extend to this court, under a construction of the constitution of the United States. That so much of the 25th section of the act of Congress to establish the judicial courts of the United States, as extends the appellate jurisdiction of the supreme court, to this court, is not in pursuance of the constitution of the United States; that the writ of error in this case was improvidently allowed under the authority of that act; that the proceedings thereon in the supreme court were coram non judice, in relation to this court; and that obedience to its mandate be denied by this court."

This is the last case which has been taken from the supreme court of that state, to the supreme court of the United States; nor has any one been taken from the present court of appeals. The case of Phalen vs. Virginia went from the general court, where the jurisdiction is about equal to a court of common pleas in New York, or a county court of Wisconsin; and the Richmond R. R. Co. vs. Louisa R. R. Co., went from the chancery court of Richmond city. No others have been taken from that state.

The license cases, 5 Howard, 505, went up from convictions in criminal complaints in the state court of Massachusetts, and it does not appear that the jurisdiction of the United States court, to take cognizance of them, was called in question by any of the parties. Nor does the court cite any authority for their jurisdiction. The amount could not be $2000, whether we consider the value of the liquor sold, or the penalty imposed.

Cohens vs. Virginia, 6 Wheat., 383, was a criminal case carried from a quarterly session court, for the borough of Norfolk, Virginia, under section 25 of the Judiciary Act,

In the matter of Booth.

and on a motion made to quash the writ of error, Judge Marshall holds these words: "One of the express objects, then, for which the judicial department was established, is the decision of controversies between states, and between a state and individuals. The mere circumstance, that a state is a party, gives jurisdiction to the court."

If these words are to have their full effect, then there can be no criminal case, even a petty offense complained of before a justice of the peace, can be carried directly to the supreme court of the United States, because the state is one of the parties! This view is sustained by the case of Brown vs. Maryland, 12 Wheat., 419; and the license cases, 5 How.,505. Though it is in direct violation of the amendments of the constitution demanded by the state of Rhode Island and other states, "That the judicia power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions," out which was not made because it was believed at the time unnecessary.

If the fact that the "state is a party," is sufficient to give jurisdiction of itself, it can add nothing to that jurisdiction, that on the trial of crime charged there may have been drawn in question some act of Congress, the constitution of the United States, or a treaty by the United States. This power, if it exists, arises under sec. 2, Art. 3, pr. 2, where the supreme court has original jurisdiction. That idea was too preposterous, and so it is referred to the first clause by the chief justice. That being so, then, the cases fall into the category of the appellate power of the supreme court, and the consequence arises, that the jurisdiction is under the exceptions and regulations which Congress shall make. Where is the act of Congress giving the jurisdiction? The court, in none of the cases, has cited i , nor can it be found, and because there is none, the argument, in all cases, is based on the necessity, or policy of having such a law; in other words, by basing an implication upon an implication, the court has raised a power, and taken jurisdiction. The case of Cohens vs. Virginia, is in direct conflict with the Judiciary Act, by going *per saltem*, over the highest court of Virginia to the quarterly sessions court of a borough, a mere justices court, and where the fine was but $100; the power stood upon the implication and necessity, and the court in reaching for power, ignored the want of law, and even the constitution.

In the case of Rhode Island vs. Massachusetts, 12 Peters, 918, Mr Justice Baldwin, giving the opinion of the court, uses these rema kable words : "The case is now before us for consideration, on a motion by the defendant, to dismiss the bill for want of jurisdiction in the cause.

"However late this objection has been made, or may be made, in any cause in an inferior or appellate court of the United States, it must be considered and decided before any court can move one step farther in the cause, as any movement is necessarily to exercise the jurisdiction. Jurisdiction is the power to hear and determine the subject matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them. The question is, whether on the case before a court, their action is judicial or extra-judicial, with or without the authority of law, to render a judgme t or decree upon the right of the litigant parties. If the law confers the power to render a judgment or decree, then the court has jurisdiction; what shall be adjudged or decreed between the parties, and with which is the right of the case, is judicial action, by hearing and determing it. 6 Peters, 706; 4 Russell, 415; 3 Peters, 203-7.

"A motion to dismiss a cause pending in the courts of the United States is not analagous to a plea to the jurisdiction of a court of common law or equity in England; there the superior courts have a general jurisdiction over all persons within the realm, and all causes of action between them. It depends on the subject matter whether the jurisdiction shall be exercised by a court of law or equity; but that court to which it appropriately belongs, cannot act judicially upon the party, and the subject of the suit; unless it

In the matter of Booth.

shall be made apparent to the court that the judicial determination of the case has been withdrawn from the court of general jurisdiction, to an inferior and limited one. It is a necessary presumption that the court of general jurisdiction can act upon the given case, when nothing appears to the contrary; hence, has arisen the rule that the party claiming an exemption from its process, must set out the reasons by a special plea in abatement; and show that some inferior court of law or equity has the exclusive cognizance of the case; otherwise the superior court must precede, in virtue of its general jurisdiction. This rule prevails both at law and in equity. 1 Ves. Sen., 204; 2 Ves. Sen., 307; Mitf., 183. A motion to dismiss, therefore, cannot be entertained, as it does not, and cannot disclose a case of exception; and if a plea in abatement is put in, it must not only make out the exception, but point to the particular court to which the case belongs. A plaintiff in law or equity is not to be driven from court to court by such pleas; if a defendant seeks to quash a writ, or dismiss a bill for such cause, he must give the plaintiff a better one, and shall never put in a second-plea to the jurisdiction of that court, to which he had driven the plaintiff by his plea. 1 Ves. Sen., 203. There are other classes of cases where the objection to the jurisdiction is of a different nature, as on a bill in chancery; and not triable by any judicial power. 1 Ves. Sen., 445. Or that the parties defendant cannot be brought before any municipal court on account of their sovereign character, and the nature of the controversy; as 2 Ves. Jr., 371, 387; 1 Ves. Jr., 56, 60; or in the very common cases which present the question, whether the cause properly belongs to a court of law or equity. To such cases a plea in abatement would not be applicable, because the plaintiff could not sue in an inferior court; the objection goes to a denial of any jurisdiction of a municipal court in one class of cases; and to the jurisdiction of any court of equity or of law in the other; on which last, the court decides according to their legal discretion. An objection to jurisdiction, on the ground of exemption from the process of the court in which the suit is brought, or the manner in which a defendant is brought into it, is waived by appearance and pleading to issue. 10 Peters, 473; Toland vs. Sprague, 12 Peters, 300; but when the objection goes to the power of the court over the parties, or the subject matter, the defendant need not, for he cannot give the plaintiff a writ or bill. Where no inferior court can have jurisdiction of a case in law or equity, the ground of the objection is not taken by plea in abatement, as an exception of the given case, from the otherwise general jurisdiction of the court; appearance does not cure the defect of judicial power, and it may be relied on by plea, answer, demurrer, or at the trial or hearing, unless it goes to the manner of bringing the defendant into court, which is waived by submission to the process.

"As a denial of jurisdiction over the subject matter of a suit between parties within the realm, over which, and whom the court has power to act, cannot be successful in an English court of general jurisdiction; a motion like the present could not be sustained consistently with the principles of its constitution. But as this court is one of limited and special original jurisdiction, its action must be confined to the particular cases, controversies, and parties over which the constitution and laws have authorized it to act; and proceeding without the limits prescribed, is coram non judice and its action a nullity, 10 Peters, 474; S. P. 4 Russ., 415. And whether the want or excess of power is objected to by a party, or is apparent to the court, it must surcease its action, or proceed extra-judicially."

This extract is favorably quoted by Daniel, Justice, in the Dred Scott case, 10 Howard, 473, and we are not disposed to controvert its doctrines.

In connection with Martin vs. Hunter may be noticed the case of Palmer vs. Allen, 7 Cranch., 550, already alluded to, in which the supreme court of the United States reversed the judgment of the supreme court of Connecticut, but on its return the latter

In the matter of Booth.

court refused to enter the required judgment. 1 Conn., 100. Also the case of Davis vs. Packard, 10 Wend., 50, where the court for the correction of errors in New York, refused to obey the mandate of the supreme court of the United States, Chancellor Walworth and Justice Sutherland writing opinions, denying the power of the supreme court of the United States, to declare what questions belonged to the jurisdiction of the state courts.

We come next to the cases carried to the supreme court of the United States from Wisconsin. The first of these is Walworth vs. Kneeland, 15 How., 348. This action was commenced before the district court of Milwaukee county, by G. A. Foster, against Walworth, and after trial and judgment in favor of Foster, Walworth appealed to the supreme court in 1851, where the judgment was affirmed. From thence Walworth appealed to the supreme court of the United States, and there the writ was dismissed for want of jurisdiction in that court.

The case of Dillingham vs. Fisher, taken to the supreme court in August 1857, went there upon a purchased record of the clerk of our supreme court, without any approval of the state judges ; and has been dismissed by the plaintiff in error, before a decision of the case. Thus has ended two of the four cases taken from Wisconsin to the supreme court of the United States. There only remains the cases, *in re*, Sherman M. Booth, 3 Wis. Rep., 1, and *in re* Booth and Ryecraft, id., 157 ; or as they are entitled in 21 How., 507, Ableman vs. Booth ; and The United State vs. Booth. Why this change of names is more than we can divine. The facts of these cases are sufficiently known to the peo ple of Wisconsin, as also the judgment of our supreme court. Beyond this statemen we propose to let Taney, C. J., speak. He says :

" On the 21st of April next following the decision of the supreme court, the attorney. general of the United States presented a petition to the chief justice of the supreme-court, (U. S.) stating briefly the facts in the case, and at the same time presenting an ex-emplification of the proceedings herein before stated, duly certified by the clerk of the state court, and avering in his petition that the state had no jurisdiction in the case, and. praying that a writ of error might issue to bring its judgment before this court to correct. the error. The writ of error was allowed and issued, and according to the rules and practice of the court, was returnable on the first Monday of December, 1855, and a citation for the defendant in error to appear on that day, was issued by the chief justice (of the U. S.) at the same time.

" No return having been made to this writ the attorney general on the 1st of February, 1856, filed affidavits, showing that the writ of error had been duly served on the clerk of the supreme court of Wisconsin, at the office, on the 30th of May, 1855, and the citation served on the defendant in error on the 28th of June, in the same year. And also the affidavit of the district attorney of the United States for the district of Wisconsin, set-ting forth that when he served the writ of error on the clerk as above mentioned, he was informed by the clerk, and he was also informed by one of the justices of the supreme court, which released Booth, 'That the court, had directed the clerk to make no return to the writ of error, and enter no order upon the journals or records of the court con-cerning the same.' And upon these proofs, the attorney general moved the court for an order upon the clerk to make return to the writ of error, on or before the first day of the next ensuing term of this court. The rule was accordingly laid, and on the 22d of July, 1856, the attorney general filed with the clerk of this court, the affidavit of the marshal of the district of Wisconsin, that he had served the rule on the clerk on the 7th of the month above mentioned ; and no return having been made, the attorney general, on the 27th of February, 1857, moved for leave to file the certified copy of the record of the supreme court of Wisconsin, which he had procured with his application for. the·

writ of error, and to docket the case in this court, in conformity with a motion to that effect made at the last term, and the court thereupon, on the 6th of March 1857, ordered the copy of the record filed by the attorney general to be received and entered on the docket of this court, to have the same effect and legal operation as if returned by the clerk with the writ of error, and that the case stand for argument at the next ensuing term, without further notice to either party."

The fact that the supreme court of the United States overlooked the disobedience of the state court to their order to make return to the writ of error, is such a confession of weakness on their part, as amounts to the confession of inability to execute it; or else that they had no jurisdiction to issue the writ. The fact is, that the writ of error now lies in the hands of the clerk of Wisconsin, unfiled and unnoticed If the issuing of the writ was necessary to give jurisdiction to the United States Court, over these cases, its return is no less an absolute prerequisite, and without both of these facts, we have no hesitancy in saying that all the acts of that court are *coram non judice*, and void for want of jurisdiction, under the judiciary act.

We have also already shown, that jurisdiction over state courts cannot be found in the constitution of the United States. It is not claimed, by the strongest advocates of the appellate power, that they find it in that instrument. The cases above cited themselves furnish the only authority needed to show by what authority the power is claimed. This writ of error is issued at the instance of the Attorney General, in behalf of the United States, and directed to the judges of Wisconsin, says Taney, C. J., (18 How., 477,) "in order to bring the said *proceedings and judgment here for revision, according to the provisions of the 25th section of the act of Congress of* 1789, Ch. 20." Mark, now, not according to the constitution : that has nothing to do with the subject matter; but "*according to the provisions of t e act of Congress.*" We shall not stop here to inquire as to the power in congress to pass this section of the Judiciary Act, but shall confine ourself to showing that the supreme court did not get jurisdiction "*according to the provisions*" of that same section.

The 25th section alluded to declares "that a final judgment or decree in any suit, in the highest court of law or equity of a state, in which a decision can be had," &c., "may be re-examined and reversed or affirmed in the supreme court of the United States, UPON A WRIT OF ERROR, the citation being signed, &c. The court could not obtain jurisdiction, except "upon a writ of error;" that is, a writ of error must be issued and served ; and if issued and served, as directed, then a return to the writ is no less necessary to give the court jurisdiction. Accordingly, Taney, C. J., says : "It was the *duty of the clerk* (of the supreme court of Wisconsin,) *to obey it, and to send a transcript of the record and proceedings therein mentioned, together with the writ of error, to this court, at the present term;* and certainly the order of no other tribunal will justify an officer in disobeying the process of this court, lawfully issued." That is plain language—language which has no ambiguity in it, and may be understood by every man who reads it. "It was the *duty* of the clerk to OBEY it." If it was his *duty*, and yet he refused, then it is equally the *duty* of the appellate court, who had jurisdiction of its own writ, to compel obedience to its command, and to have compelled the clerk "to send a transcript of the record and proceedings" to the supreme court; not only to send the transcript, but to send it "*together with the writ of error*" issued in the case. A purchased record is not sufficient. That the Attorney General had already filed in the case, with his petition for his writ ; but it must be a *transcript of the record and proceedings*, with the writ of error ; that is, it must be attached to the writ of error, and made as a return thereto, by the clerk of the state court. Hence, the C. J. said in another place : "The court will take such order in the case as will enable it to fulfil the duties imposed upon it," and

"lay a rule upon the clerk to make the return required by the writ of error, on or before the first day of the next term of the court ; or to show cause, if any he hath, to excuse or justify his neglect or refusal to obey the writ." Such was the position taken by the supreme court, and if true at the time, it must still be so.

Now, what are the facts ? The writ of error in this case was issued April 21st, 1855, and delivered to the clerk of the supreme court of Wisconsin, by John R. Sharpstein, May 30th, 1855. The clerk refused to file the writ, or to make any return thereto ; but on the contrary thereof, the writ now lies in his desk, and not among the files of the court. At the December term, 1855, of the court, the Attorney General of the United States moved to docket the case, and bring it on to argument in the supreme court of the United States, where the motion was denied ; and then the rule was granted on Mr. Kellogg. That rule has been served and treated in the same manner as the writ of error had been. The reason for issuing that rule was, to give the court jurisdiction of the record and proceeding of the Wisconsin court, and was declared to be the step that would "enable it to fulfil the duty imposed upon it." The rule is disobeyed, and the court had not therefore taken the steps which enabled it to fulfil its duty, unless it now takes this ridiculous position, that the rule laid on the clerk was unnecessary, and so much wind, words, and waste time, as well as paper : a position that the advocates of the appellate power in that court will scarcely concede. If, then, the court had not taken "such order in the case as would enable it to fulfil the duties imposed upon it," it was its further duty to take some other order, and to compel the return, or else to confess its utter inability to compel obedience to its writs and mandates. But if it could not compel obedience to its writs, in so small a matter as the procuring of a return to the writ of error, can it be contended, that it can assume a jurisdiction of the matter, " upon a writ of error," without any return to the writ ; upon a writ which is itself lodged in the hands of the officer to whom it is addressed, and who steadily refuses to obey the mandate of both the writ and the rule, laid upon him ? The course pursued by that court shows conclusively one of two things : either the supreme court is unable to enforce its appellate power, *according to the 25th section* of the judiciary act, or it does not possess the power at all.

We care not which of these two positions be assumed : they both lead to the same conclusion, that the supreme court of the United States did not have jurisdiction in this case, and not having jurisdiction, its mandate is void, and Mr. Justice Cole was right in refusing to allow it to be filed in the supreme court of Wisconsin.

In the maintenance of this position we shall be sustained by the authorities and practice " upon a writ of error." Without the writ, and the return, the record of the case in the supreme court is incomplete, and would not be received in evidence in any court of record in England or the United S.ates. There can be no instance or precedent found for the practice here pursued. The time and the exigency foreshadowed by Justice Baldwin, 14 Peters, 631, has come, when, " Though resistance to its mandate may be contingent, or merely possible, it ought to be well considered whether, when it should happen, the court feel assured that they would be sustained by the law and the constitution, in enforcing obedience by mandamus, attachment, and the imprisonment of the judges of the highest court of a state." And before doing so, it should look wel. to its jurisdiction, as the exercise of the high prerogative is but the annihilation of a sovereign state, of the United States, and a dissolution of the Union.

The supreme court of the United States did not obtain jurisdiction of the case of Booth upon *habeas corpus*, from the supreme court of the state of Wisconsin, because there was no return of the writ of error. This return was absolutely necessary to give that court jurisdiction, and without it the court proceeded without authority, in attempting

In the matter of Booth.

to reverse the order of the supreme court of Wisconsin, under the 25th section of the judiciary act, because there was no jurisdiction in the United States court. We now assert that the proceedings of the supreme court of the United States was without precedent; on the contrary, their proceedings are in direct contradiction to their own decisions in several causes. Thus they have decided that no writ of error or appeal, or any other writ, will lie to carry a case or proceeding on *habeas corpus* from a circuit court of the United States to the supreme court. And we may ask if a writ of error will not lie to the "inferior courts" of the United States, how much less would it lie to a state court? The answer should come from the advocates of the appellate power, and not from us. There has been one writ of error before this, sent to a state court, a full report of which is found in 14 Peters, and the writ was dismissed for want of jurisdiction in the supreme court to examine the case. If that were the position of that court no longer ago than 1840, by what statute of Congress, or amendment of the constitution, did it get jurisdiction of a similar case in 1856? And until the jurisdiction is shown, we insist that the case of Holmes is a full and conclusive answer to the case of Booth; or, in other words, we might answer the argument of Taney by the arguments of the judges in Holmes' case, and we think it would have been well for the chief justice, at least, to have noticed them. But as he has not done so, nor answered what, to our minds, was the better argument, we may be excused, if we prefer to abide by the decision of the supreme court of the United States, before it demeaned itself by crying "great is the god of the cotton fields," and fell down before the slave power, and became subservient to a party of oppression, rather than to the opinion given at the behest and under the crack of the driver's lash. In this part of the argument, the doctrine of *stare decisis* as to the appellate power of the supreme court of the United States, will not avail. We may grant the power in some cases, and yet it does not follow that it exists in a *habeas corpus* case, to remove such a case by writ of error. On the other hand, the precedents, as we think, show that the writ will not lie in these cases. A reference to a few must suffice, especially when it is understood that they are all on one side.

We shall let the same supreme court tell us what is the effect of the want of jurisdiction in their own words. We quote from Trimble, Justice, in Elliott vs. Peirsol, 1 Pet., 240 : "Where a court has jurisdiction it has a right to decide every question which occurs in the cause; and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding in every other court. But if it act without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void, and form no bar to a recovery sought, even prior to a reversal, in opposition to them. They constitute no justification, and all persons concerned in executing such judgments or sentences, are considered in law as trespassers. This distinction runs through all the cases on the subject, and it proves that the jurisdiction of any court exercising authority over a subject, may be inquired into in every other court, when the proceedings of the former are relied on and brought before the latter by the party claiming the benefit of such proceedings."

But as the chief justice had forgotten this decision; so too he makes no reference to *exparte* Watkins, 3 Pet., 201, by Chief Justice Marshall : "A petition was presented by Tobias Watkins for a *habeas corpus*, for the purpose of inquiring into the legality of his confinement in the jail of the county of Washington, by virtue of a judgment of the circuit court of the United States of the District of Columbia, rendered in a criminal prosecution instituted against him in that court. The petitioner alleged that the indictments under which he was convicted and sentenced to imprisonment, char ed no offence for which the prisoner was punishable in that court, or of which that court could take cognizance, and consequently that the proceedings were *coram non judice*. The supreme

court has no jurisdiction in criminal cases which could reverse or affirm a judgment rendered in the circuit court in such a case, where the record is brought up directly by writ of error." "The writ of *habeas corpus*, as has been said, is of the nature of a writ of error, which brings up the body of the prisoner, with the cause of confinement, and the court can undoubtedly inquire into the sufficiency of that cause."

The same great constitutional judge tells us in *ex parte* Bollman, 4 Cranch , 93 : " Courts which originate in the common law possess a jurisdiction which must be regulated by the common law, until some statute shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction. The state courts are not, in any sense of the word, inferior courts, except in the particular cases in which an appeal lies from their judgment to this court, and in these cases the mode of proceeding is particularly described, and it is not by *habeas corpus*. They are not inferior courts, because they emanate from a different authority, and are the creatures of a distinct government. The jurisdiction which the court is now asked to exercise is clearly, appellate. It is the revision of a decision of an inferior court, by which a citizen has been committed to jail. The question brought forward on a *habeas corpus* is always distinct from that which is involved in the cause itself. The question, whether the individual shall be imprisoned, is always distinct from the question whether he shall be convicted or acquitted of the charge on which he is to be tried, and therefore these questions are separated, and *may be decided in different courts*. The decision that the individual shall be imprisoned, must always precede the application for a writ of *habeas corpus*, and this writ must always be for the purpose of revising that decision, and therefore appellate in its nature."

Could language be more explicit than this of Marshall? And how can our opponents answer it? They must overrule the principles here laid down. They must and do assume to take jurisdiction in a criminal case, and reverse or affirm a judgment where the record is carried up not directly, but indirectly by writ of error. Has it come to that pass, that the supreme court could do that indirectly which they could not do directly? We all know that in criminal cases the sovereign cannot protecute a writ of error at all under any circumstances. And we have quoted Chief Justice Marshall to prove that a criminal cannot himself sue out this writ in the United States courts. Thus Booth could not have prosecuted a writ of error from the judgment of Judge Miller. If that were so, has it given jurisdiction to the supreme court to affirm that decision, because they did not, for want of a return, get jurisdiction of the case upon a writ of error sued out by the United States to the supreme court of the state of Wisconsin? If we could believe such a principle, we should next be prepared to believe in any of the vaguaries of a mad man's brain.

But we must overturn another principle; we must elevate a court whose jurisdiction is defined by written law, and which cannot transcend its limits, above the courts of common law, and let it re-examine, and affirm or reverse the decisions of the latter at pleasure; and when we ask, where is the source of the power to do this great thing, echo answers, "where?" We must go one step further still, and declare that the state courts are inferior courts. They were not so declared by the suppeme court in 1808, the year that Congress dared obey the constitution and prohibit the importation of slaves into the United States, and when Thomas Jefferson was at the head of affairs. But we must go on from this point, we must hold that the question whether a man shall be imprisoned, is inseparable from the question whether he has been, or shall be, convicted for a crime; and that he can be tried in but one court. Thus all the great lights of the law must be extinguished, in 1860, and for what?

The language of Mr. Justice Thompson in the case of Holmes, 14 Peters, 584, appears

In the matter of Booth.

to us to be unanswerable. Holmes was held under a warrant of the Governor of Vermont, to be delivered as a fugitive from justice from Canada, for having committed murder, and he had applied for a *habeas corpus* to the supreme court of that state, and after hearing, was remanded into custody. He then sued out a writ of error to the United States supreme court, and the writ was dismissed for want of jurisdiction, the court being equally divided. The judge there says:

" It appears to me to be a very strong and cogent objection to taking jurisdiction in this case, that a reversal of the judgment will be entirely unavailing, unless the supreme court of Vermont shall voluntarily discharge the prisoner. It is certainly not in the power of this court to enforce its judgment. If the jurisdiction of this court was clearly and plainly given, it might not be a satisfactory answer, that it could not execute its judgment. But where the authority of this court depends upon a doubtful construction of its appellate power, it furnishes a persuasive reason against applying the power to a case which may result in a nugatory and fruitless judgment. It is not to be presumed that Congress would vest in this court a power to judge and decide, and withhold from it the authority to execute such judgment. It would be of no benefit to the party, and would be placing the court in no very enviable a situation. If the proceeding in a *habeas corpus* is a suit within the meaning of the judiciary act, an execution of the judgment is the fruit and end of the suit, and is very aptly called the end of the law. And the provisions contained in this twenty-fifth section of the judiciary act show very satisfactarily, in my judgment, that the revising power of this court, was not intended to be applied to any case where the court could not execute its judgment. The act declares that the writ of error shall have the same effect as if the judgment or decree complained of, had been rendered or passed in a circuit court. And the proceedings upon the reversal shall also be the same, except that the supreme court, instead of remanding the cause for final decision, as before provided, may, at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution. This looks to a case where the state court refuses to execute the judgment of this court. No such provision is made or allowed, when the writ of error is to a circuit court of the United States. In such case the judiciary act declares that the supreme court shall not issue execution in causes that are remanded before them by writs of error, but shall send a special mandate to the circuit court to award execution thereon. And what is the reason for this different mode of execu ing the judgment of this court ? It is because this court can coerce the circuit courts to execute the mandate. The judiciary act gives to the supreme court the power to issue writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed, or person holding office under the authority of the United States; and that the courts of the United States shall have power to issue writs of *scire faci s, habeas corpus,* and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law.

" But no such coercive power is given over a state court; and hence the necessity of authorizing this court to execute its own judgment. If the supreme court of Vermont shall refuse to execute the judgment of this court requiring the discharge of the prisoner Holmes, can this court, in any way, enforce its judgment? If it can be done at all, it must be by sending a *habeas corpus* to the sheriff or jailor, having the custody of the prisoner, to bring him here to be discharged. And if that officer· shall return that he holds him under a commitment of the supreme court of Vermont, what can this court do ? We must remand him, and there ends our jurisdiction.

" By sec. 14, the power of this court to execute its judgment, is expressly taken away, and the prisoner obtains no relief. And can it be reasonably supposed that Congress in-

tended by this 25th section of the Judiciary Act, to embrace cases where the judgment must be a dead letter, and at most merely advisory, and the expression of an opinion upon an abstract question, but utterly fruitless, if the advice shall be disregarded. I cannot yield my assent to the assumption of a power which must place this court in such a feeble and inefficient situation. If this court has the power to meet the exigency of the case at all why not apply at once the appropriate and efficient remedy by *habeas corpus*, and relieve the prisoner from his illegal imprisonment. But if this power is denied to the court, can it be that the act of Congress has clothed us only with the naked authority to advise the supreme court of Vermont to discharge the prisoner? I think not. And that it is, therefore, a case not embraced under the 25th section of the judiciary act; and the appellate power of this court cannot reach the case."

The language of Justice Baldwin, in the Holmes case, is equally unanswerable, as applied to this case of Booth. He says, 14 Peters, 625, "Another objection, equally fatal to the writ of error is, that though the awarding the writ of *habeas corpus* is a matter of right, and 'is granted *ex debito justiciæ*,' yet the action of the court is governed by its sound discretion, exercised on the whole circumstances of the case, according to which the relief is allowed or refused on motion. But a rule or order, denying the motion, is not a judgment; 'it is only a decision on a collateral or interlocutory point, which has never been deemed the foundation of a writ of error,' which lies 'only upon a final judgment or determination of a cause.' 'A very strong case illustrating the doctrine is, that error will not lie to the refusal of a court to grant a peremptory mandamus,' &c., as held by the House of Lords. Vide 6 Pet., 656, 657, and cases cited; 9 id., 4, 6. No principle is or can be better settled by this court, than that no writ of error lies upon any proceedings in a cause, depending on the discretion of the court. 1 Pet., 168; 6 id., 217, 656; 7 id., 149; 13 id., 15. There can be no case more peculiarly and exclusively of that description, than one which is declared to be 'the appropriate process' for that purpose. 4 Cranch, 100. 'A mere inquiry, without deciding upon guilt,' id. 125; 'always distinct from the question, whether he shall be convicted or acquitted,' id., 101; and is directed only to the process, 7 id., 573; 9 id., 710, not to the final determination of the cause, 6 id., 657; but to a decision on a mere interlocutory, collateral point, and is cautiously excluded from revision on error by the judiciary act.

"The same result is found in 'the principles and usages of the common law,' as laid down in the time of Coke, without a single deviation to this time. In 8 Co., 127, b., 128, a, it was declared that no writ of error could lie upon a *habeas corpus*, because it was '*festinum remedium*.'"

We should have been glad to cite further from the case of Holmes, but the length of this note forbids. The chief justices of the United States, and of the state of Wisconsin, as well as the author of the preceding note, have all overlooked it, conclusive as it is of this case of Booth, upon this point of want of jurisdiction; and we shall dismiss it by repeating, that the argument of Justice Baldwin, is to our mind unanswerable and conclusive, that the writ of error in this case, as in that of Holmes, was improperly sued out, and that the supreme court of the United States never obtained jurisdiction of the subject matter; and, therefore, that all their proceedings were *coram non judice*.

This same principle, that a writ of error will not lie in a *habeas corpus* case, is established in Rex vs. The Dean and Chapter of Trinity Chapel, in Dublin, 8 Mod., 27; S. C. 2 Bro. P. C., 554; Yates vs. The People, 6 John., 429, by C. J. Kent; The Queen vs. Paty et al., 2 Salk, 503; 2 Ld. Raymond, 1105; 8 How., St. Tr. 142; Bell vs. The State, 4 Gill, 304; Russell vs. The Commonwealth, 1 P. and Watts, 82; Wade vs. Judge, 5 Ala., 18; Howe vs. The State, 9 Miss., 690; Matter of Perkins, 2 Cal., 424; Ex parte Mitchell, 1 La Ann., R., 413. So well was this doctrine settled, that in New York, Virginia, Florida,

South Carolina, Mississippi, Texas, and Ohio, laws have been enacted to permit an appeal or writ of error to be sued out to the superior court in these cases. Congress has not done so. We have cited these cases in answer to the doctrine of *stare deciscis*, and think that, by that very doctrine we have proved that the whole proceeding in the United States court was *coram non judice*.

This question, whether the writ of error would lie at all in the case, must be settled before any consideration of the appellate power of the United States' supreme court need be had at all. And from all the authorities, and from every view of this case, upon the constitution and the laws, we think there can be but one answer to that question, and that must be in the negative. And if so, it necessarily follows that the motions were properly denied by the supreme court of Wisconsin.